ROSS (REED v.). See Case No. 11,652.

## Case No. 12,080.
### ROSS v. UNION PAC. RY. CO.
[4 Woolw. 26.] [1]

Circuit Court, D. Kansas. Oct. 28, 1863.

Specific Performance — When Injunction Allowed — Delivery of Bonds — Executory Contracts — For Building Railroad.

1. When allowed on a bill for specific performance of a contract, an injunction should be granted, if, upon the case made therein, the court ought to entertain it, and the defendant will, probably, before the hearing, render itself incapable of executing the contract specifically.

2. But if it does not state a case on which, at the hearing, specific performance will be decreed, an injunction, which is sought only to make the final decree effective, ought not to be allowed.

[Cited in Chicago & A. Ry. Co. v. New York, L. E. & W. R. Co., 24 Fed. 521.]

[1] [Reported by James M. Woolworth, Esq., and here reprinted by permission.]

3. Bonds of the United States are public stocks, and a covenant for their delivery will not be specifically enforced in a court of equity.

4. The reason of the case is in favor of holding the same rule in respect of shares in a railroad company. (1.) They belong to a class of securities generally called stocks, are bought and sold every day in the market, and the prices at which they sell are quoted in the commercial reports: one share has no peculiar value. The damages for failure to deliver them may be awarded at law, and afford complete compensation. (2.) So are the earlier cases.

[Cited in Eckstein v. Downing (N. H.) 9 Atl. 627.]

[Cited in Megibben's Adm'rs v. Perin, 49 Fed. 188.]

5. Unless the court can decree specific performance of the whole of a contract, it will not interfere to enforce any part of it; e. g., a contract for the delivery of both government stocks and railroad bonds—assuming that the latter may be compelled—cannot be enforced.

[Cited in Kansas Const. Co. v. Topeka R. R., 135 Mass. 37.]

6. An executory contract will not be specifically enforced unless the remedy is mutual.

7. The performance of a comparatively inconsiderable part of a contract, e. g., the expenditure of $50,000 in building a railroad which will cost $12,000,000, does not take it out of the class of executory contracts.

[See Fallon v. Railroad Co., Case No. 4,629.]

8. A contract to build a railroad will not be enforced in equity.

[Cited in Fallon v. Railroad Co., Case No. 4,629; Oregonian Ry. Co. v. Oregon Ry. & Nav. Co., 37 Fed. 734; Texas & P. Ry. Co. v. Marshall, 136 U. S. 407, 10 Sup. Ct. 850.]

[Cited in Danforth v. Philadelphia & C. M. Short-Line Ry. Co., 30 N. J. Eq. 15.]

9. The case of Lucas v. Comford, 3 Brown, Ch. 166, in which Lord Thurlow refused to enforce a building contract, saying that the court would not undertake to superintend the construction of a building, has not been overruled; and the cases in which it has been held otherwise are distinguishable from it.

10. The cases in which specific performance of building contracts has been decreed in equity, are where (1) the building was to be done upon the land of the person who agreed to do it; (2) the consideration for the agreement was the sale or conveyance of the land on which the building was to be erected, and the plaintiff had already, by such conveyance, on his part, executed the contract; (3) the building was in some way essential to the use, or contributory to the value, of adjoining land belonging to the plaintiff; (4) the court could dispose of the matter by an order capable of being enforced at once; it will not decree a party to perform a continuous duty extending over a number of years.

The act of congress incorporating the Union Pacific Railroad Company granted the same aid to the Leavenworth, Pawnee, and Western Railroad Company as it did to the main line; that is, a certain amount of land and of government bonds per mile. The last-named company was incorporated by the legislature of Kansas, and by an act of the same legislature, its name was changed to the Union Pacific Railway (Eastern Division). On the 19th of September, 1862, this company, by its former name, entered into a contract with Ross, Steel, & Co., the substance of which, so far as it is material to be stated here, was as follows: Ross, Steel, & Co. agreed to furnish all the materials for, and to construct, complete, and equip a first-class railroad from the mouth of the Kansas river, on the south side thereof, to the one hundredth meridian, together with necessary buildings, &c., according to a certain prescribed standard, of the best available material, with a branch to Leavenworth; to locate the line according to the act of congress above mentioned, and upon the most feasible route, with the easiest curves and grades practicable; to commence the work on the 1st day of November, 1862, and complete the same within the time prescribed by the act. The company agreed to pay for the work, as each section of forty miles was completed, at rates per mile as follows: 1st, $16,000 in United States bonds; 2d, $11,500 in bonds of the company, secured by mortgage on all its property and earnings; 3d, $6,000 in full paid stock of said company. These payments are to be made as each section of forty miles is accepted by the United States commissioners, as provided for in the act. As each section is completed, it is to be turned over by the contractors to the company, the same to be kept in good order and condition until accepted by the commissioners. The company was also to appoint three persons to act as trustees for the holders of its mortgaged bonds, and superintend the issue, sale, and cancelling of them, and the payment of interest thereon. Disagreements arising between the parties in the course of the work were to be referred to the arbitrament of an engineer named, whose decision was to be final; and should he decide that the work was not progressing with sufficient rapidity, the company was to be at liberty to put on an additional force to carry it forward, so long as Ross, Steel, & Co. neglected to do so. Ross, Steel, & Co. entered upon the execution of this contract. They expended some $50,000 upon the grading, and had about one hundred men employed on the work, and had made provision in the way of material and capital for pushing the work forward with vigor. No payments had been made by the company. About the 1st of June, 1863, General John C. Fremont and Samuel Hallett purchased almost all of the stock of the company, and thus obtained entire control of its affairs. Shortly afterwards they notified Ross, Steel, & Co., that they should ignore the contract, and construct the road themselves. Some negotiations were had between the parties, but they finally separated, the one side insisting upon, and the other repudiating, the contract. About the 15th of June, 1863, a deed of trust, in the name of and by the company, was executed to Washington Hunt and Samuel B. Ruggles, as trustees, of all the line of railroad built and to be built, with its equipment, to secure certain bonds to be issued thereunder, to the amount of $5,760,000; and on the 1st day of July, another deed of trust was in like manner made

to the same trustees of the lands of the company, to secure other bonds to be issued thereunder, to the amount of $7,200,000. These deeds of trust completely disposed of all the assets of the corporation. and conveyed away the entire property upon which Ross. Steel, & Co. were to be secured for building the road. No bonds had yet been issued under either of the deeds of trust. The parties have also given it out that the said company have made a contract with Hallett for the construction of the road. The object of the bill was to enjoin the issue of the bonds under the two several deeds of trust, and have them delivered up to be cancelled; and for a decree compelling the specific performance of the contract. A motion was now made for an injunction and was argued by

Mr. Browning and Mr. Joy, in support thereof.

Mr. Ewing and Mr. Stinson, contra.

MILLER, Circuit Justice. This is an application for an injunction, on a bill filed in the circuit court of the United States for the district of Kansas. The material matters set forth in the bill may be shortly stated thus: In September, 1862, the plaintiffs, under the partnership name of Ross, Steel, & Co., contracted with the defendant, under the corporate name of the Leavenworth, Pawnee, and Western Railroad Company, which has since been changed to its present style, that they would build for it a railroad in the state of Kansas, some 350 miles in length, the same to be part of the great Pacific Railway provided for by the act of congress. The defendant, on its part, agreed to pay for said road, as each section of forty miles should be built, equipped, and furnished ready for use, and accepted by the commissioners, as provided in the act of congress, the sum of $33,500 per mile. This sum was to be made up as follows: $16,000 of the bonds of the United States, to be issued under said act; $6,000 of the paid-up stock or shares of the company; and $11.500 of the bonds of the company, secured by a first mortgage on the road and its appurtenances. and on the land granted by the government to aid in its construction. The plaintiffs have done work and furnished material to the value of $40,000 or $50,000. They have made extensive arrangements for procuring the necessary capital, and for the purchase of the iron; and are fully ready and able to prosecute the work, diligently and successfully. But the defendant has notified them that their contract is. forfeited, and the work covered by it he has employed other parties to perform. To secure its bonds. which are to be delivered to the new contractors for their work, the defendant has made two mortgages on the road and its appurtenances. and on its lands. These mortgages are entirely different from those which are provided for in the contract with the plaintiffs, and if the bonds are issued thereon, the defendant will be unable to comply with his covenants to them in relation to the same subject matter. The bonds have not been issued yet. The bill therefore prays for an injunction to prevent their issue, and, on final hearing. that the defendant may be decreed specifically to perform its covenants in said contract. and for general relief. If, for the purpose of compelling the parties to perform specifically their contract, the court, on the case made by the bill, ought to entertain it, it should grant the injunction; because, otherwise, before a hearing on the merits. the defendant would probably render itself incapable of giving to the plaintiffs first mortgage bonds as it has agreed to do. On the other hand. if, on the hearing, specific performance will not be decreed, there is no ground for the injunction, which is sought only for the purpose of making the final decree effective. We are called upon, then, to inquire, in the first place, whether the case made by the bill is one in which a court of equity will decree specific performance of the contract.

In considering the question of the jurisdiction of the court to enforce them by decree, the covenants of the defendant may be treated as requiring the delivery of three kinds of securities—namely: (1) The bonds of the United States provided to be issued by act of congress; (2) the paid-up shares of the company; (3) the bonds of the company secured by mortgage.

1. The bonds of the United States are stocks within any definition which can be given to that term. They are public stocks, government stocks. The decisions are clear and uniform, that a covenant for their delivery will not be specifically enforced in a court of equity. 2 Story, Eq. Jur. §§ 717, 717a, 718, 724a. The cases cited in the notes to these sections of Judge Story's work (Redfield's Ed.) fully sustain this doctrine. They cover a period of two hundred years, coming down to the present time. In reference to this class of stocks. no case is cited to the contrary.

2. As to the shares in the railroad company, I think the rule should be the same. I see no sound reason for any distinction between them and government stocks. They belong to a class of securities which are generally called stocks; they are the subject of every day sale in the market, and the rates at which they are selling are quoted in the public commercial reports, so that their value is as readily and certainly ascertained as that of government stocks. No especial value attaches to one share over another, and the money which will pay for one, will as readily purchase another. The damages, then, for failure to deliver any such shares may be awarded at law, and be an adequate compensation for the injury sustained. And this has been the holding of the courts for a hundred years. Cud v. Rutter. 1 P. Wms. 570. 5 Vin. Abr. 538, decided in 1719, was a bill

to compel the delivery of South Sea stock according to a contract alleged. Lord Chancellor Parker, "delivering his judgment with great clearness," as the reporter says, held, "that a court of equity ought not to execute any of these contracts, but to leave them to law, where the party is to recover damages, and with the money may, if he please, buy the quantity of stock agreed to be transferred to him; for there can be no difference between one man's stock and another's. It is true, one parcel of land may vary from, and be more commodious, pleasant, or convenient than another parcel of land, but £1,000 South Sea stock, whether it be A., B., C., or D.'s, is the same thing, and in no sort variant; and therefore let the plaintiff. if he has a right, recover in damages, with which, when received, he may buy the stock himself." So also are Cappur v. Harris, Bunb. 135; Dorison v. Westbrook, 5 Vin. Abr. p. 540, pl. 22.

In all the cases in which in former times specific performance was decreed, the reason existed, and the court proceeded upon the reason that damages at law afforded no sufficient compensation, on account of some peculiarity in the stock contracted to be delivered, or in the situation of the parties. Of this class are Colt v. Nettervill, 2 P. Wms. 304; Buxton v. Lister, 3 Atk. 383; Gardener v. Pullen, 2 Vern. 394. In England, by recent decisions, the jurisdiction seems to have been extended beyond the early cases. In them it has been said that there is no analogy between government stock and railroad shares, because the latter are limited in amount, and are not always to be had in the market. Duncuft v. Albrecht, 12 Sim. 189; Shaw v. Fisher, 5 Railway & Canal Cas. 465; Parish v. Parish, 32 Beav. 207. Whether the distinction taken in these cases shall be held finally to prevail in this country, and, if it be established, whether it shall be held applicable in principle to cases like this, I need not now determine. But conceding that if this contract called for only the shares in the company and its bonds. a specific performance of it might be decreed by this court, how does the case stand when the first-mentioned class of property, as to which we have seen that the contract cannot be specifically enforced, is coupled with the other two classes?

If this bill can be maintained, we are to suppose that when the first section of fifty miles of road is completed, the plaintiffs will call on the court to compel the defendant to perform the contract to that extent. There will then be due from the defendant to the plaintiffs $1,675,000; $800,000 of which will be payable in government stock, of which this court cannot compel the delivery, and $875,000 in railroad shares, of which delivery may be decreed. Now, will the court, on a covenant, which is a unit. give the plaintiffs this partial relief, and as to one half of it in nominal amount, and perhaps more than one half in value, turn them over to a court of law

for damages? In a court of law. strict and technical performance, on the part of the plaintiffs, of their covenants is essential to a recovery. In a court of equity, time is not of the essence of the contract. Thus the contract. becomes subject, in different courts, to wholly different rules of construction, and to different kinds of relief, which may prove, in reality, both a snare to the plaintiffs, and a detriment to the defendant. And this has been ruled in several cases. Thus in Gervais v. Edwards, 2 Dru. & War. 80, Sir Edward Sugden in Ireland held that, unless the court can decree specific performance of the whole of a contract, it will not interfere to enforce any part of it. And in South Wales Ry. Co. v. Wythes, 1 Kay & J. 186, 24 Law J. R. Ch. 1, Lord Justice Knight Bruce says: "I find no authority for the proposition that where the main body of an agreement is not fit to be performed, or rather the specific performance of which is not fit to be enforced in equity, the subsidiary part of it can or ought to be enforced, particularly when the peculiar nature of that subsidiary part is considered." This contract remains unexecuted. It is true that the bill alleges that the plaintiffs have done work, and furnished material, to the value of $40,000 or $50,000. But the contract, if executed by them, would require from them $12,000,000 of work and material. The amount already expended, compared with that to be expended. is too inconsiderable to take the case out of the class of executory contracts. It is the settled doctrine of this court that such a contract will not be specifically enforced, unless the remedy is mutual: that is to say, that the covenant of the plaintiff, to be performed on his part, and that of the defendant on his part. must both be of such character that, if either of them shall be delinquent, the court can give relief by compelling its performance specifically by him. 2 Story, Eq. Jur. §§ 711, 723, 790; Cathcart v. Robinson, 5 Pet. [30 U. S.] 264. I proceed, then, to inquire whether this contract is of such a character that. if the plaintiffs were in default. it could be specifically enforced as against them by a decree of this court.

The covenant on the part of the plaintiffs, although expressed in very simple terms, is nevertheless a very grave undertaking. It is, that they will, within such time as the act of congress requires, build about 360 miles of railroad, and equip and furnish the same complete with rolling stock, depots, &c., ready for use, furnishing all the materials necessary for this extensive work. Shall this court, in addition to, or rather before, enforcing the covenants of the defendant, undertake to enforce performance on the part of plaintiffs of this covenant of theirs?

No case is reported, I believe—at least none has been produced on the hearing—in which the court has undertaken to compel a party to build a railroad. In fact, the case of South Wales Ry. Co. v. Wythes, 1 Kay & J., 186,

5 De Gex, M. & G. 880, is to the contrary. In this case the court refused specific performance of an agreement for the building of a branch railway, which was entered into during the pendency of a bill before parliament. See, also, Attorney General v. Birmingham & O. Junct. Ry. Co., 3 Macn. & G., 453, 16 Jur. 113, affirming 15 Jur. 1024, 7 Eng. Law & Eq. 283; People v. Albany & V. R. Co., 24 N. Y. 261.

There are several cases on the subject of building houses and bridges, which, as that subject bears an analogy to that of building railroads, I will now examine. The first case claiming attention is that of City of London v. Nash, 3 Atk. 512, 1 Ves. Sr. 12. In this case, Lord Hardwicke decreed, that a covenant in a lease to rebuild should be specifically enforced, on the ground that it was essential to the security of the landlord; but, at the same time, he held that a covenant to repair would not be enforced, because compensation in damages could be had at law. This case does not seem to place the jurisdiction of the court to compel the performance of the contract on any ground generally applicable to building contracts. The next case, in the order of time, is Errington v. Aynesly, 2 Brown, Ch. 341, in which Sir Lloyd Kenyon, master of the rolls, refused to decree a specific performance of a contract to build, mainly on the ground that if one person would not build, another might be found who would. In Lucas v. Comerford, 3 Brown, Ch. 166, 1 Ves. Jr. 235, decided very shortly after the above case, Lord Thurlow held the same doctrine, and refused a decree, saying, that the court could not undertake to superintend the construction of a building, any more than it could the repairing of it. In Mosely v. Virgin, 3 Ves. 184, Lord Loughborough refused to decree the performance of a contract to lay out £1,000 in a building, because there was not sufficient definiteness in the contract. But he took occasion to say, that there would be a distinction between the case of a covenant to repair, and one to build; and that cases might arise where the contract, being sufficiently specific, might perhaps be enforced. I think that Lord Loughborough, in alluding to Lord Thurlow's decision, did not correctly state the grounds of it; yet it does not seem to me that he intended to overrule that decision, or that he said anything which could have such an effect. In Flint v. Brandon, 8 Ves. 159, the chancellor refused to decree the specific performance of an agreement to level and fill up a gravel-pit, on the ground that an adequate remedy for a breach of such contract could be had at law.

Thus far it would seem that no case overrules the decision of Lord Thurlow against decreeing specific performance of building contracts. We are now, however, to examine a class of cases which are supposed to establish a contrary doctrine. Before we enter upon their consideration, let us remark certain circumstances which attend them. (1)

In each case, the building was to be done upon the land of the person who agreed to do it. (2) The consideration for the agreement, in every instance, was the sale or conveyance of the land on which the building was to be erected; and the plaintiff had already, by such conveyance on his part, executed the contract. (3) In all of them, the building was in some way essential to the use, or contributory to the value, of adjoining land belonging to the plaintiff.

The first of these cases is that of Storer v. Great Western Ry. Co., 2 Young & C. Ch. 48. The plaintiff had sold to the railway company the right of way through his pleasure-grounds, and the company had agreed, in order that he might have the full use of his adjoining land, that it would make an arched way under its road-bed, large enough for a wagon loaded with hay to pass with facility. The court decreed that the arched way should be made. The vice chancellor said, that "it was competent for that court to enforce the specific performance of a contract by the defendant to do defined work upon his own property, in the performance of which the plaintiff has a material interest, and one which cannot be compensated in damages." The next case is that of Price v. Mayor, etc., of Penzance, 4 Hare, 506. In this case, the plaintiff had sold the town some land, and the corporation covenanted to lay out streets, and build houses on it, especially to erect a fish-market. The defendants, without awaiting a decree, built a market. The court, although the relief was not resisted, approved the principle above stated. Vice Chancellor Wigram says: "The contract was, that the corporation having purchased the plaintiff's land, should, at their own expense, make a street, and also a market. Under this contract, the corporation have taken possession of the land, and converted it; and having had the benefit of the contract in specie, as far as they are concerned, I need not say that the court will go to any length which it can, to compel them to perform the contract in specie." In Stuyvesant v. Mayor, etc., of New York City, 11 Paige, 414, the plaintiff, being the owner of a large tract of land in the city of New York, had granted to the city corporation a certain part thereof for the purposes of a public square; and in the conveyance which was executed by the defendant, it covenanted to grade, inclose, and improve the premises in a manner therein provided, the plaintiff having exacted this covenant in order to increase the value of the adjoining lands which he retained. After two judgments at law for damages, he brought his bill for specific performance, and Chancellor Walworth decreed in his favor. In the course of his opinion, that distinguished jurist says: "The true rule on the subject of decreeing the specific performance of a covenant in such cases is, that where, from the nature of the relief sought, performance in specie

will alone answer the purposes of justice, this court will compel a specific performance, instead of leaving the complainant to a remedy at law, which is wholly inadequate. The court has jurisdiction, therefore, to compel the specific performance by the defendant of a covenant to do certain specified work, or to make certain improvements or erections, upon his own land for the benefit of the complainant, as the owner of the adjoining property, who has an interest in having such work done or such improvements or erections made; and where the injury to the complainant, from the breach of the covenant, is of such a nature as not to be capable of being adequately compensated in damages." In Birchett v. Bolling, 5 Munf. (Va.) 442, the partners had entered into a contract to build a hotel on the land of the plaintiff, which he agreed to convey for that purpose, and to receive two shares of the capital stock of the hotel therefor. He conveyed, and removed some buildings from the land, and delivered possession. The other parties commenced erecting the hotel, but afterwards abandoned the enterprise. The court decreed that they should complete the building. All these cases are clearly referable to the principle laid down in the case of Storer v. Great Western Ry. Co. Judge Story adopted the precise language of the court in that case, without claiming that the principle goes any further. Story, Eq. Jur. § 721a. I think the cases cited rest on a principle clearly distinguishable from that of enforcing building contracts generally, in which parties have contracted, for money or personal property as the consideration, to build on the plaintiff's land; and there is no special reason to render non-performance incapable of being compensated in damages. In a case reported in 3 Humph. (Tenn.) 657, upon a contract like that in the case last cited, except that it was wholly executory, the court refused to decree specific performance against the party who was to convey the land, although the plaintiffs were ready and willing to perform on their part.

I have thus attempted to analyze all the cases bearing on the subject which have been cited by counsel, or which I have been able to find in the short time I have had for examination; and I do not think that any of them overrule, or are in any manner inconsistent with, the case decided by Lord Thurlow, in 3 Brown, Ch. 166, notes, 1 Ves. Jr. 235. On the contrary, the decrees which have been granted are based upon principles entirely reconcilable with that case. And when we take into consideration the length of time it has stood, during which no decree, resting on the general principle, has been rendered to enforce a building contract, I am inclined to concur fully with Judge Story, that "in cases of contract to build a house or a bridge," or, I will venture to add, a railroad, "a specific performance would not now be decreed." 2 Story, Eq. Jur. § 716, note 2.

I have been much pressed by counsel for the plaintiffs with the argument of the distinguished jurist just named, in favor of a general enforcement of this class of contracts. 2 Story, Eq. Jur. § 728. But it is evident that the author is there stating not what the rule is, but what he thinks it should be. And I cannot say that I am very strongly impressed by the reasoning with which he supports the abstract propriety of his opinion. It seems to me, that to establish the general doctrine that contracts for building may be specifically enforced in equity, would be to invite into litigation, very many matters which are now generally settled by the parties on a basis much more beneficial to both; and that it would require the constant supervision of the court, through its officers, in the conduct of affairs, it is very poorly adapted to administer. The result of the court's drawing to itself such a jurisdiction would certainly be far less remedial than the ordinary action for damages.

There is another consideration to be noted in this connection. If the act to be done by the delinquent party, whether the plaintiff or the defendant here, were a single act, to compel which a single decree of the court would be sufficient, a case would be presented very unlike that before us. Years must elapse before this work can be done and paid for. At every step in its progress, the interposition of the court, either by orders in this case, or by decrees in successive cases, may be invoked, if we are at this time to lend the aid of chancery to either of the parties. It is not difficult to foresee the mischiefs of such a course. The rule is settled, even in the English chancery, where the jurisdiction is greatly extended in all such cases, that it will decree specific performance only when it can dispose of the matter by an order capable of being enforced at once; that it will not decree a party to perform a continuous duty extending over a number of years, but will leave the opposite party to his remedy at law. It was on this principle that Lord Hardwicke proceeded in the case of City of London v. Nash, cited above. In answer to the objection to the plaintiffs having specific performance of the contract, he expressly says: "The objection will not hold, for upon a covenant to build, the plaintiffs are clearly entitled to come into this court for a specific performance—otherwise on a covenant to repair; for to build is one entire single thing, and if not done prevents that security which the city of London has for the rent by virtue of the lease." And this may have been a reason, and a very strong reason, for the rule, now well settled, that a covenant to repair will not be specifically enforced. Gervais v. Edwards, 2 Dru. & War. 80; Hills v. Croll, 2 Phil. 60; Sanderson v. Cockermouth, etc., Ry. Co., 11 Beav. 497; Nickels v. Hancock, 7 De Gex. M. & G. 300, 327; Ogden v. Fossick, 11 Wkly. Rep. 128.

The case cited above of South Wales Ry. Co. v. Wythes, 1 Kay & J. 186, 24 Law J.

Ch. 1, is in many of its features like that before us now. After some negotiations between the parties, not necessary here to notice, a memorandum was entered into between the company and the defendants as contractors, providing, among other things, that "the company to find the land within a reasonable time, and build the stations. The contractors to give a bond to the amount of £50,000 to secure the performance of their contract, and to undertake to execute the works for a double line of railway, and the ballasting and permanent way for a single line, according to the terms of the specification to be prepared by the engineer for the time being of the company, for the sum of £290,000, to be complete ready for opening by the 1st of December, 1855, to be paid in a new stock to be created, bearing £5 per cent. interest from the day of the line being so ready for opening, such interest being derived from the receipts upon the branch line, £60 per cent. of such gross receipts being devoted to such purpose, and an additional £10 per cent. of such receipts, making £70 per cent., on all traffic over the said branch, which shall pass to and from, or beyond Carmathen, or any other more distant place on the main line, the residue of the gross receipts upon the said branch being retained by the company for working the branch; any arrear of the interest of £5 per cent. in one year to be made good out of any surplus in any following year or years until the stock is redeemed. * * * Any of the details of this arrangement, in case of difference, to be determined by a referee, to be appointed by the solicitor general for the time being, on the application of either party, such referee to draw out and settle, on behalf of both parties, the documents necessary to carry it out. The arbitrators, under working clause, to have the power of considering whether the mode of working the Pembroke branch is reasonable, having reference to the company's mode of working the branch to Heyland, and if the arbitrators make any award, both parties to abide by it."

A bill was filed to compel the specific performance of this contract by the company against the contractors. To the bill was a general demurrer, which Vice Chancellor Woods sustained, and the case was appealed to the lord justices. Lord Justice Knight Bruce, in his judgment, says: "There are several very satisfactory reasons why a specific performance of this agreement should not be enforced in a court of equity, and I will mention some—I do not say all—of those reasons. In the first place, by the agreement, it is provided, in the most vague terms, that the plaintiffs shall find the land—the land, I suppose, for the stations—within a reasonable time, and build the stations; then the contractors are to give a bond for £50,000 to secure the performance of their contract, and they are to execute the works for a double line of railway according to the terms of the specification to be prepared by the engineer "for the

time being' of the company; then the contract provides for the payment of a sum of £290,-000 to the defendants, with interest, in a manner which I assume, for the purposes of the argument, to be intelligible. Skilful, experienced, and honorable as the engineer of this present time, and of the time of the contract, is and was, it is obvious that the engineer of the time when the works may be, if ever, completed, may not be the engineer of to-day, and the engineer of that time might be both incompetent and dishonest. In my opinion, it would not be a proper course for a court of equity to take, to force such an agreement on any man or body of men. But, then, it has been said, that a specification has been prepared by the present engineer of the company, Mr. Brunel; but this makes no difference. Whether if such specification had been not only prepared, but accepted and approved of by the defendants, that would have made any difference, it is not necessary to say, because there is no such allegation in the bill; the only allegation in the bill being, that the plaintiffs believe that the specification had been approved." He closes by saying: "I have never known any attempt like the present; and certainly this court will be no party to the entertainment of a suit to enforce so vague, so obscure, so uncertain an agreement, the suit to enforce which has been successfully demurred to; and the suit, being frivolous and utterly vain, will be of course dismissed, and, equally of course, be dismissed with costs."

It will be observed that the infirmity of uncertain and vague stipulations is common to that and this contract, for this line of road remains unlocated, and, according to the usual course of such enterprises, must be subject to changes not possible now to foresee; and in this way differences irreconcilable between the parties, and which this court cannot determine, may, and almost certainly will, arise. So, too, as to the performance of the work, the same difficulties are very likely to occur. Then there is the great consideration of time. Years will be required for the execution of the contract. In the case cited, twenty-two miles of a branch road was to be built. Here is a line of 360 miles stretching out into a new, unpopulated, almost unknown region. Other points of similarity might be mentioned. In fact, where the cases differ, it is against the claim of the plaintiff here.

It seems, therefore, that in granting this injunction, which would require that this railroad should be built, equipped, and delivered by one party, and payments made by the other under the control and compulsion of the court, I should be going far beyond any adjudged case, or any principle established by any adjudged case. More than that, I should proceed in the very face of some of the highest authorities, and, in direct opposition thereto, inaugurate a policy without a precedent, involving interests of the greatest consequence to every-day life. The effect of the doctrine, if established, no wisdom can foresee.

Entertaining these views, I must decline to make this advance, and shall overrule the motion for an injunction. Motion for an injunction overruled.