EURASIA IMPORT CO., INC. *v.* UNITED STATES

**No. 5964.**—Invoices dated Kobe, Japan, June 30 and 20, 1939.
Certified July 5 and June 30. 1939.
Entered at New York, N. Y., July 15 and August 8, 1939.
Entry Nos. 37360 and 38092.

(Decided December 17, 1943)

*James W. Bevans* for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*Samuel D. Spector,* special attorney), for the defendant.

WALKER, Judge: These are appeals filed under the provisions of section 501 of the Tariff Act of 1930, as amended by section 16 (b) of the Customs Administrative Act of 1938, from returns of value made by the United States appraiser at the port of New York on dyed cotton velveteen exported from Kobe, Japan, in June and July 1939. The official papers show that appraisement was made on the basis of export value, which is defined in section 402 (d) of the Tariff Act of 1930. Foreign value is not involved, since it appears that merchandise of the type in issue was not permitted to be manufactured for domestic consumption in Japan at the time of exportation involved.

Plaintiff concedes that export value is the proper basis for appraisement, but contends that such value at the time of exportation was lower than the appraised values, and, in fact, equalled the entered values.

The merchandise was of two qualities, No. 100, which was entered at .375 yen, except where cut in 15-yard lengths, when it was entered at .380 yen, and No. 200, which was entered at .485 yen, all net, packed. Quality No. 100 was appraised at .465 yen, and No. 200 at .570 yen, all net, packed.

It appears that part of the difference between the entered and appraised values is to be found in two disputed items, one of a commission charged by the shipper of the merchandise, and the other a so-called export control fee. In disposing of the issue, I find it necessary to set forth certain facts which appear in the record, and which are not apparently disputed, surrounding the exportation from Japan of merchandise such as that involved at the time in question.

Some time in 1936 American manufacturers of cotton velveteen sought an increase in the rate of duty applicable to such merchandise, or to make it dutiable on the basis of American selling price, which is defined in section 402 (g) of the tariff act aforesaid. In order to avoid such an event, it was agreed between representatives of such manufacturers and an association which represented the Japanese manufacturers and exporters to limit the amount of velveteen which might be exported from Japan to the United States in 1 year to 2,000,000 square yards. The term of the agreement was later extended, and it was in force at the time of exportation of the merchandise here involved.

In administering control of the export quantities of velveteen a quota system was set up by the Japan Cotton Yarn and Piece Goods Exporters Association for America whereby 80 per centum of the 2,000,000 square yards was allocated to members of the association in proportion to the actual quantity of shipments made in the preceding year, while the remaining 20 per centum was allocated to the members of the association by auction.

It appears that the association mentioned above was a semi-official organization, operating under the auspices of the Japanese Government. It also appears that it was one of eight exporters' associations, the other seven being formed to operate with respect to exportation of such goods to various other countries. From April of 1939 it appears that a correlated organization, known as the Export Velveteen and Corduroy Manufacturing Co., Ltd., was in operation to control the manufacture of such goods. A report of an acting Treasury attaché which is in evidence as exhibit 18, indicates that all manufacturers and dealers in velveteen goods could sell for

export only to members who belonged to one or the other of the eight exporters' associations referred to above.

It should be stated that there is a paragraph in the report, exhibit 18, purporting to be a quotation from a letter received by the Treasury attaché from an official of the Export Velveteen and Corduroy Manufacturing Co., Ltd., which reads as follows:

*Direct purchase by U. S. importers.*

From the standpoint of the pertinent ordinances or the control regulations of the association, there is nothing to prevent (importers from placing orders directly with dealers). However, from a practical standpoint, dealers are not acquainted with export procedure, cabling, etc., and they may not be able to handle direct business with the importers.

This seems to be at variance with the facts, as outlined above, that manufacturers and dealers could sell for export only to members of the exporters' associations. However, there does not appear to be any dispute that no velveteens could be exported from Japan to the United States except against the various allotments of the quotas held by members of the exporters' associations.

In order to defray the costs of administration of the exporters association, a so-called control fee, consisting of a charge of 1 sen 11 rin, or 0.0111 yen, per yard, was collected on all merchandise exported to the United States.

In the case at bar it appears that the exporter, A. Cameron & Co., Ltd., of Kobe, Japan, was holder of an allotment under the quota system. It is contended by the plaintiff, however, that in the transactions here involved Cameron acted as buying agent for the plaintiff and not as seller of the merchandise, and that the export value of the merchandise was the price at which such merchandise was offered for sale by the manufacturers, which, it is claimed, in each case equalled the invoice price less, among other things, the export control fee and the buying commission.

As I view it, the price paid to the manufacturer could not, under the facts shown in the record, represent export value for the reason that the manufacturer could not freely offer the merchandise for sale to all purchasers in the ordinary course of trade for exportation to the United States. There was a special class of persons, namely, members of the exporters' association, through which purchases had to be funneled. The record indicates that purchases of their allotments could be made by the members either for their own account or for the account of others, but no one could buy for export without obtaining the use of a quota allotment, all of which were held by members of the association.

Otherwise expressed, the situation was this: No one could buy directly from the manufacturer, but all purchases had to be made either through commissionaire members of the association, who

charged a commission for their services, or from members of the association who bought from manufacturers for their own account, and who presumably made a profit on the transaction. If there was an export value for the merchandise, therefore, it was the price at which the members of the exporters' association offered it for sale to all purchasers, either including their commission or their profit, as the case may be. The situation is somewhat akin to that which obtained in the case of *Batten v. United States*, 5 Ct. Cust. Appls. 447, T. D. 34975, wherein it was said:

It does here appear, however, conclusively that these goods can not be purchased other than of the commissionaires, that they can not be purchased of the manufacturers, that they can not be purchased at a price less than that paid these commissionaires including the commission. This is the only evidence in the record as to the actual market value of these importations in the country of exportation. There is at least no evidence before us showing that the goods are ever sold in the open markets of the country of exportation at less than the price including this commission.

The sanction for considering purchasing commissions ordinarily as nondutiable and not part of the value of goods for tariff purposes rests on the fact that the purchaser could, if he so desired, transact his business directly with the seller, and so save the cost of the commission. *United States v. Enrique Vidal Sanchez*, 15 C. C. P. A. 443, T. D. 42642. This was not the fact in the case of the velveteen at bar. There was no way a purchaser could escape paying either a commission to a purchasing agent or an item of profit to an intermediate owner. Under such circumstances the ordinary rule with respect to purchasing commissions does not apply, and they become part of the value of the goods.

With reference to the export control fee, I find the record does not indicate when such fee accrues. In some instances it appears to have been included as part of the *per se* price of the goods when sold by or through the association member in Japan, while in others it was separately specified. Apparently it was somewhat in the nature of a semiofficial export tax. In *Sternfeld v. United States*, 12 Ct. Cust. Appls. 172, T. D. 40065, the subject of export taxes was treated, and it was pointed out that if the—

* * * market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States * * * . (Sec. 402 (C), Tariff Act of 1922.)

did not include the tax, that is to say, if it did not accrue at the time of sale of the goods, then it was not part of the export value of the goods for appraisement purposes, even though the tax was paid by the purchasers upon exportation of the goods.

It is clear that the control fee was considered part of the export value of the merchandise by the appraiser, and in view of the state of the record with reference to it, I am unable to hold otherwise.

It appears, however, that even with the buying commission shown to have been paid with respect to the merchandise at bar and the control fee added to the entered values, there is still a difference between the entered and appraised values.

On behalf of the plaintiff there was offered in evidence collective exhibit 1, consisting of some 63 sheets, 47 of which purport to be statements as to market value on certain dates from April 1939 to May 1941, which statements do not appear to be offers or quotations, and each of which was, on its face, made after the date as to which market value was stated. Ten sheets purport to be quotations as of dates between September 2 and 9, 1940, and five as to quotations in 1941, while one dated February 26, 1941, does not purport to give a quotation on velveteen but merely refers to an order for velveteen given the day before without setting forth any details. It will thus be seen that none of them can have any weight in the determination of the issue before me, which concerns the export value of certain types of velveteen in June and July 1939, and I so hold.

Collective exhibit 2, offered on behalf of the plaintiff, consists of 7 sheets of paper. The first sheet purports to be a so-called "contract note" or confirmation of a sale to the plaintiff by Capelouto & Ashkenzai, apparently a firm of purchasing agents in Kobe, of certain dyed cotton velveteen stated to be "Quality No. 1600." There is nothing to show that "Quality No. 1600" was the same as the quality No. 200 here involved, as claimed by plaintiff, and hence the exhibit is valueless as evidence. Furthermore, no mention is made thereon as to the amount of buying commission to be paid, the price being stated as "F. O. B. Kobe."

The remaining six pages of collective exhibit 2 represent confirmations of orders placed by a representative of the plaintiff with a firm of purchasing agents known as Nakagiri Shoten in Kobe, Japan. Four of them are dated April 6, 1939, one is dated June 6, 1939, and one September 29 of the same year. They record sales of quantities of cotton velveteens of the qualities here involved, and it is noted that the "First Cost" as specified therein is uniform, that is, .375 yen per yard, packed, for the quality No. 100, and .495 yen per yard, packed, for the quality No. 200. "First Cost" obviously means the price less commission and export control fee, that is to say, the price paid the manufacturer. On the same sheets are found what purport to be prices for the same goods "App. C. I. F. New York" when shipped via Panama Canal. These, it may be noted, are less than the appraised values on a c. i. f. basis, but there is no explanation of the meaning of the abbreviation "App." It may mean "approx-

imately," in which case the figures given are useless as a base to calculate back to export value.

It is interesting to note that plaintiff's single witness, Jacob E. Parks, who stated he was in charge of all purchases for the plaintiff, testified that on May 5, 1939, an order was placed with Fujisaki Bros., a Japanese firm, for velveteen apparently similar to quality No. 100 on which a price of 18½ cents c. i. f. New York was paid. Deducting the charges for freight, insurance, cartage, petty expenses, consular fee, quota fee, quota auction fee, and buying commission, all of which were claimed to be nondutiable and the amounts of which were not stated, Mr. Parks said that that price was equal to a cost of the merchandise of 37 sen per yard, or .37 yen, net, packed. However, it appears, by the calculations of the examiner who passed the merchandise in question, and who testified at the trial on behalf of the defendant, that a c. i. f. New York price of 15½ cents per yard for the same quality of merchandise was the equivalent of an f. o b. Kobe price of .465 yen, net, packed, including the quota fees and buying commission. Unless the buying commission was more than the 4 per centum which the record shows was charged in the case at bar, or the other charges were greater, there is no explanation for the comparatively large difference between these prices.

After carefully reviewing the entire record I am satisfied that the plaintiff has not established export values for the merchandise other than the values found by the appraiser. During the course of the presentation of defendant's case the examiner of merchandise who examined and inspected the merchandise in issue was called to the stand and questioned as to the basis of the values which he recommended to the appraiser in connection with the appraisement of such merchandise.

If the purpose of the defendant in so doing was to rebut the evidence offered by the plaintiff by going forward and establishing the export value of the goods as defined by the statute, I am satisfied that it fell short of accomplishing that purpose. If the purpose was to establish the correctness of the appraiser's action, I am satisfied that it failed in that regard also. However, I do not deem it necessary to enter into a detailed discussion of the action of the examiner. It is sufficient to note that the examiner does not appraise the merchandise; that is the function of the appraiser, according to the provisions of section 500 of the Tariff Act of 1930. How the recommendations of the examiner influenced the appraiser in reaching the conclusion he did does not appear in the record. As was said in *United States* v. *Woolworth* 26 C. C. P. A. 33, T. D. 49576,

* * *. There is no evidence of record as to what facts were before the appraiser, or what his reasons were for approving the examiner's action. See *United States* v. *Manahan Chemical Co., Inc.*, 24 C. C. P. A. (Customs) 53, T. D. 48333.

As the record stands, the values found by the appraiser have not been proved to be incorrect, and under the provision of section 501 that—

The value found by the appraiser shall be presumed to be the value of the merchandise and the burden shall rest upon the party who challenges its correctness to prove otherwise.

they must be considered to be the values of the merchandise.

I therefore find that export value as defined in section 402 (d) of the Tariff Act of 1930 is the correct basis of value for the merchandise in issue, and that such value in each case was the appraised value. Judgment will issue accordingly.