UNITED STATES *v.* KLEBERG & CO., INC., ET AL. (No. 4067)[1]

[1] T. D. 49256.

United States Court of Customs and Patent Appeals, October 25, 1937

*Joseph R. Jackson*, Assistant Attorney General (*Daniel I. Auster* and *John F. Kavanagh*, special attorneys, of counsel), for the United States.
*Lamb & Lerch* (*John C. Lerch* of counsel) for appellees.

[Oral argument October 11, 1937, by Mr. Auster and Mr. John G. Lerch]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

LENROOT, Judge, delivered the opinion of the court:

This is an appeal involving certain reappraisement proceedings. The merchandise involved consists of thirteen importations of safety matches from Austria, seven of which were entered at the port of New York and six at the port of Boston. The importations were made during the years 1929 and 1930 under the Tariff Act of 1922. The matches were manufactured by Aktiengesellschaft "Sirius" vorm. Hermann Wieffenbach of Vienna.

The local appraiser appraised the merchandise on the basis of foreign value under the provisions of section 205 of the Antidumping Act, 1921, hereinafter quoted.

Appraisements under the Tariff Act of 1922 are not involved, the matches being subject to a specific rate of duty of 8 cents per gross of boxes under paragraph 1417 of said act.

On March 23, 1931, the Secretary of the Treasury issued the following finding, T. D. 44718:

TREASURY DEPARTMENT, *March 23, 1931.*

*To Collectors of Customs and Others Concerned:*

After due investigation in accordance with the provisions of section 201, antidumping act, 1921, I find that the industry of manufacturing safety matches of the strike-on-box type in the United States is being and is likely to be injured by reason of the importation into the United States of safety matches of the strike-on-box type from Austria, and that such safety matches of the strike-on-box type have been sold and are likely to be sold in the United States at less than their fair value.

A. W. MELLON,
*Secretary of the Treasury.*

In his return to the collector the appraiser reported that said finding applied to all of the matches here involved.

Appellees took separate appeals with respect to each of the importations and on December 10, 1934, a hearing was had before Judge McClelland sitting in reappraisement. The cases were tried together and a single record was made. Upon such hearing appellees introduced in evidence certain affidavits which, among other things, related to the cost of production of the involved merchandise. No oral testimony was offered by appellees.

At the conclusion of the introduction of evidence in behalf of appellees the Government moved for a continuance of the cases in order that it might have opportunity to rebut the statements in the affidavits relative to the cost of production of the merchandise. This motion was denied, the trial judge stating that the case had then been eleven times upon the calendar. Thereupon one witness testified on behalf of the Government and certain special agents' reports were received in evidence.

After the evidence had been taken the Government renewed its motion to continue the cases, and further moved that "the case be transferred to Boston, these being consolidated cases, and six of them being Boston entries." Both of said motions were denied, whereupon the cases were submitted for decision.

Thereafter, in February 1936, appellees moved to set aside said submission of the cases, and to restore them to the docket for the purpose of introducing further proof.

On February 27, 1936, this motion was granted over the objection of the Government.

On March 10, 1936, the Government moved to set aside the order reopening the cases, which motion was denied on March 18, 1936.

On April 28, 1936, further hearing was had before Judge McClelland, at which hearing appellees introduced in evidence, over the objection of the Government, an affidavit of one Carlberg, which was marked Exhibit 7 and reads as follows:

    \*       \*       \*       \*       \*       \*       \*

I, Stellan Carlberg, residing at von Platensgatan 10, Jönköping, Sweden, being first duly sworn, depose and say:

That at all times hereinafter mentioned I was a director of the Swedish Match Company, and assistant to its managing director and as such it was among my duties to know, and I am familiar with, the matters hereinafter stated.

That during the calendar years of 1929 and 1930, all of the matches supplied to the Austrian market were produced by the four factories under our control, namely:

    (1) "Solo," Zündwaren- und Chemische Fabriken Act. Ges. in Vienna,

    (2) Aktiengesellschaft "Sirius" vorm. Hermann Weiffenbach in Vienna.

    (3) Salzburger Zündwarenfabrik Handler & Pfifferling in Vienna,

    (4) "Bibi" Zünder Gesellschaft m. b. H., Jarolden.

That no matches during these two years were exported from any of the above factories to countries other than the United States without permission of the Swedish Match Company, the said company having complete control over the exportation of matches from the said factories. That this was the policy of the said company by reason of the fact that it had its own agent in each country of the world to which matches could be exported.

That the aforementioned factories during this period were members of an Association known as "Ignis Zündhölzchen-Verkaufs-Gesellschaft m. b. H." and that this Association dealt only in sales for home consumption in Austria, and did not ship for export to other countries.

That I was familiar with the activities of Elof Hansson of Gothenburg, Sweden, and that Hansson did not sell or offer for sale any Austrian-made matches to countries other than the United States except under the control of the Swedish Match Company.

That all of the matches that were sent to the United States either direct from Austria or through Elof Hansson were made by Aktiengesellschaft "Sirius" vorm. Hermann Weiffenbach in Vienna, or Salzburger Zündwarenfabrik Handler & Pfifferling in Vienna.

That during the years 1929 and 1930 it was my business, amongst other things, to supervise the production and sale of matches by the Austrian factories. That the cost of producing the matches sent to the United States was as follows:

|  | For 10,000 boxes | |
| --- | --- | --- |
|  | 1929 | 1930 |
| Raw materials | S 81. 46 | S 89. 42 |
| Wages | 27. 04 | 33. — |
| Salaries, office and factory expenses, depreciation and other overhead expenses | 71. 86 | 85. 16 |
| Total | 180. 36 | 207. 58 |

That the item "Salaries, office and factory expenses, depreciation and other overhead expenses" includes the usual general expenses incident to the production of these matches.

That the items shown above, "Raw materials" and "Wages," include not only the cost of materials, of fabrication, manipulation or other process employed in the manufacturing or producing of these matches, but also the cost of all containers and coverings and all other charges and expenses incident to placing the merchandise in condition packed ready for shipment to the United States. That this cost of containers and coverings, etc., did not exceed for the years 1929 and 1930, S. 13. —, for 10,000 boxes.

STELLAN CARLBERG.

\*  \*  \*  \*  \*  \*  \*

The Government offered no evidence and the cases were again submitted for decision.

On June 15, 1936, the trial judge rendered his decision finding that there was no foreign value of the merchandise, as defined by section 205 of the Antidumping Act, 1921, and that appraisal should be made on cost of production under section 206 of said antidumping act, hereinafter quoted.

The trial judge found that the cost of production for the matches imported in 1929 was 193.75 Austrian schillings per 10,000 boxes, and for the matches imported in 1930 the cost of production was 223.15 Austrian schillings per 10,000 boxes, and that "the purchase price or exporter's sales price within the meaning of those terms as defined in sections 203 and 204 of the antidumping act, *supra*, for the matches in issue is as returned by the appraiser in each case." Judgment was entered accordingly.

The Government petitioned for review of such decision and judgment by the appellate division, and on December 1, 1936, the Second Division rendered its decision affirming the judgment appealed from.

Judgment was entered accordingly, and from such judgment the Government took the appeal now before us.

Upon its appeal the Government has filed 17 assignments of error, but its brief is limited to two issues stated therein as follows:

The questions for this court to decide are:

1. Has the importer proven an absence of foreign value for this merchandise under the provisions of Section 205 of the Antidumping Act of 1921?

2. If the importer has proven an absence of foreign value, has he properly proven cost of production under the provisions of Section 206 of that act?

However, upon the oral argument before us the Government urged two other points set out in its assignments of error as grounds of reversal:

1. The denial of the motion of the Government on the original hearing before the single judge to continue the cases, and

2. The refusal of the trial court to transfer the cases to Boston for hearing on the six entries made at that port.

Before going to the merits of the cases, we will dispose of the contentions last above set out. With respect to the motion for continuance, we would observe that this motion was made on the first hearing of the cases in December 1934. At that time appellees introduced certain evidence relating to the cost of production of the involved matches, and the Government sought a continuance in order to give it an opportunity to investigate that subject and rebut such evidence. This motion was denied by the trial judge. It was not renewed when the cases were reopened two years later, over the objection of the Government. The cases were reopened by the trial court for the reception of any evidence that either party desired to introduce. The Government introduced no testimony and submitted the cases upon the record made. Two months elapsed between the time of reopening the cases and the second hearing. The Government had notice that appellees would rely upon cost of production of the merchandise, and irrespective of the motion made in December 1934, it does not appear that the Government did not have ample opportunity to present such evidence as it might desire, in April 1936. We therefore hold that the Government was not prejudiced by the denial in 1934 of the motion to continue the cases.

With respect to the claim of the Government that the trial judge erred in denying its motion to transfer six of the cases to Boston for hearing, it is sufficient to say that, at most, this was discretionary with the court, and reversal may not be predicated upon such denial. *United States* v. *Enrique Vidal Sanchez*, 15 Ct. Cust. Appls. 443, T.D. 42642. The record before us discloses no abuse of this discretion.

The Government has assigned errors going to the admission of certain affidavits in evidence, but such assignments are so clearly

without merit that they require no discussion. The alleged errors go to the weight to be given to the affidavits and not to their admissibility.

This brings us to the consideration of the principal issues involved in this appeal, relating to foreign value and cost of production of the merchandise.

Regarding foreign market value, the only question before us is whether there is any substantial evidence in the record in support of the finding of the appellate division and trial court that there was no such value, as defined by section 205 of the Antidumping Act, 1921, which reads as follows:

### FOREIGN MARKET VALUE

SEC. 205. That for the purposes of this title the foreign market value of imported merchandise shall be the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is sold or freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade for home consumption (or, if not so sold or offered for sale for home consumption, then for exportation to countries other than the United States), plus, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for shipment to the United States, except that in the case of merchandise purchased or agreed to be purchased by the person by whom or for whose account the merchandise is imported, prior to the time of exportation, the foreign market value shall be ascertained as of the date of such purchase or agreement to purchase. In the ascertainment of foreign market value for the purposes of this title no pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account.

Upon this point we quote the following from Exhibit 1, an affidavit introduced in evidence by appellees:

The undersigned, Bernard Furth, Vienna, I. Esslinggasse 16., being duly sworn hereby deposes and says:

That he is the managing director of "Ignis" Zündhölzchen-Verkaufs-Gesellschaft m. b. H., hereinafter called "Ignis", that he has acted in this capacity from 1926 to this day and that he is fully familiar with the operations of this association during the years 1929 and the first three months of 1930;

That "Ignis" is an association of all match manufacturers in Austria, namely: "Solo", Zündwaren- und Chemische Fabriken Act. Ges. in Vienna, Aktiengesellschaft "Sirius" vorm. Hermann Weiffenbach in Vienna, Salzburger Zündwaren-fabrik Handler & Pfifferling in Vienna and "Bibi" Zünder Gesellschaft m. b. H. in Jarolden, and that it was formed in the year 1926.

That "Ignis" handels the sales of all matches sold in the domestic markets of Austria;

That "Ignis" sells, with the exceptions mentioned below, only to certain privileged dealers belonging to an association called "Verband der Zündwaren-Grossisten" at a price agreed upon between "Ignis" and the Government of Austria, and that, leaving the exceptions mentioned above out of question, dealers outside said association of dealers cannot purchase any matches except from the members of the association in which case they have to buy at prices higher than the wholesale prices fixed by the Austrian Government and "Ignis"

(see below). The exceptions above referred to consist of a few dealers who on account of certain reasons are entitled to buy matches directly from the "Ignis". The total purchases made by these dealers amount to not more than 7¾% of the total quantity sold by "Ignis." Other dealers not included in these 7¾% have no right to be supplied directly by "Ignis", by which is proved that there exists no free market in Austria;

*     *     *     *     *     *     *

Exhibit 6 is a report of a customs attaché, introduced in evidence by the Government. In this report it is stated:

By a special arrangement with the Government, only three factories are allowed to manufacture matches in Austria. These factories are : Sirius A. G., Salzburger Zuendwarenfabrik, Solo A. G.

For the privilege of manufacturing matches, the Sirius A. G. must pay the Government Austr. Schill. 6— on every 1,000 boxes matches sold, a so-called "Zuendmittelsteuer" (tax on inflammables) an excise tax. This tax is included in the price.

Two other match factories receive a compensation in the form of a yearly bonus from the three factories mentioned above, to refrain from manufacturing matches. The share of the Sirius A. G. is Austr. Schill. 3.00 per 1,000 boxes sold and this bonus is included in the price.

These three factories mentioned above maintain a common selling agency in Vienna, known as "Ignis G. m. b. H." The expenses of maintaining this agency is calculated to the Austr. Sch. 0.80 per 1,000 boxes for each manufacturer and this amount is included in the price by the Sirius A. G.

The price at which the three factories have agreed to sell matches in the home market is Austr. Sch. 32.30 per 1,000 boxes. The "Ignis" obtains orders and apportions them among the three factories, which deliver the merchandise f. o. b. destination. An average freight charge of Austr. Sch. 3.00 is included in the price.

It will be observed that section 205 of said antidumping act provides that for the purposes of that act, the foreign market value of imported merchandise shall be the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is sold or freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities, and in the ordinary course of trade, for home consumption; or if not sold or offered for sale for home consumption, then for exportation to countries other than the United States.

The first inquiry here is whether there is substantial evidence in the record of lack of foreign market value of such or similar merchandise, based upon sales or offers for sale for home consumption, in accordance with the statutory provisions.

There is substantial evidence in the record that the sales of matches for home consumption in Austria were not made directly by the factories producing the same, but through a single selling agency, "Ignis," and that in 1929 and 1930 said selling agency sold and offered to sell matches at a price fixed by agreement between itself and the Government of Austria; that said agency did not sell or offer to sell to all purchasers, but, with certain exceptions, only to an association of

150

dealers; and that dealers not belonging to said association were not permitted to purchase matches from said selling agency, but could purchase the same only from dealers belonging to the association, at a higher price than the wholesale prices fixed by the Austrian Government and the selling agency "Ignis." The exception to this rule is stated in the affidavit, Exhibit 1, as follows:

* * *. The exceptions above referred to consist of a few dealers who on account of certain reasons are entitled to buy matches directly from the "Ignis." * * *

We are of the opinion that this practice constitutes a restricted market, and hence there is substantial evidence in the record that a foreign-market value, based upon the price of the matches for home consumption, at the time of the exportation of the matches here involved, did not exist.

The Government, in support of its contention that there is no substantial evidence in the record of lack of foreign value based upon home consumption, relies upon the cases of *United States* v. *Diagonale*, 22 C. C. P. A. (Customs) 517, T. D. 47497, and *Happel & McAvoy (Inc.)* v. *United States*, 16 Ct. Cust. Appls. 161, T. D. 42791.

In the *Diagonale* case it was simply held that lack of competition as to price alone did not constitute a restricted market. In the case at bar, had the matches been freely offered to all purchasers, in the ordinary course of trade, at the price fixed by the selling agency, then the *Diagonale* case would have been applicable; but here there is more than mere price fixing involved, for there is substantial evidence in the record that the matches were not, at the fixed price, freely offered to all purchasers in the ordinary course of trade.

The case of *Happel & McAvoy (Inc.)* v. *United States, supra,* involved the appraisement of certain hydrogen peroxide imported from Austria. It appeared that one Haim, the seller of the imported merchandise, was also the manufacturer thereof, and was the only manufacturer of hydrogen peroxide in Austria; that he had made an agreement to sell such merchandise in Austria for home consumption to but one customer, and that sales to this customer were not in usual wholesale quantities. This customer, one Neuber, sold the hydrogen peroxide and freely offered the same in usual wholesale quantities to all purchasers for home consumption at a fixed price. This court held there was some substantial evidence in the record that the price at which Neuber sold the merchandise constituted foreign value under section 402 (c) of the Tariff Act of 1922, and affirmed the judgment of the lower court. It is evident from the foregoing that this case has no application to the case at bar.

To conclude upon this branch of the subject, we hold there is substantial evidence in the record that matches such as are here involved were not, in 1929 or 1930, freely offered to all purchasers in the usual

wholesale quantities, in the ordinary course of trade, for home consumption in Austria.

Section 205 of said antidumping act provides that if there be no foreign market value based upon sales or offers for sale for home consumption, sales or offers for sale for exportation to countries other than the United States shall be considered.

The affidavit, Exhibit 7, states that no matches made in Austria were exported to countries other than the United States without permission of the Swedish Match Co., which, the affidavit states, controlled the Austrian match companies, and that the reason for such restriction was the fact that the Swedish Match Co. had its own agent in each country of the world to which matches could be exported. We think a fair construction of this affidavit requires a holding upon our part that there is some substantial evidence in the record that there was no foreign market value of Austrian matches based upon sales or offers for sale for export to countries other than the United States.

It is our conclusion that there was no reversible error in the holding of the appellate division that there was no foreign market value of matches such as are here involved.

We next come to consider whether there is any substantial evidence supporting the finding of cost of production by the trial court and the appellate division.

In the affidavit, Exhibit 1, is found the following:

That when the wholesale prices are determined by agreement between "Ignis" and the Government they are based on the cost of production of "Ignis" members who have to produce their cost figures and submit them the Government;

That the said cost of production for the years 1929 and 1930 was as follows:

|  | For 10,000 boxes | |
| --- | --- | --- |
|  | 1929 | 1930 |
| Raw materials | S 81.46 | S 89.42 |
| Wages | 27.04 | 33.00 |
| Salaries, office and factory expenses, depreciation, and other overhead expenses | 71.86 | 85.16 |
| Total | 180.36 | 207.58 |

That the aforementioned cost figures refer to the so called "4/4"-size which is the same size as exported to the United States;

\*  \*  \*  \*  \*  \*  \*

The affidavit, Exhibit 7, gives the same figures of cost of production as are set out in Exhibit 1. The affidavit, Exhibit 7, also states that while the items "Raw materials" and "Wages" include the cost of all containers and coverings, this cost of containers and coverings did not exceed, for the years 1929 and 1930, 13 Austrian schillings per 10,000 boxes.

Section 206 of said antidumping act reads as follows:

### COST OF PRODUCTION

SEC. 206. That for the purposes of this title the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing, identical or substantially identical merchandise, at a time preceding the date of shipment of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of identical or substantially identical merchandise;

(3) The cost of all containers and coverings, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2)) equal to the profit which is ordinarily added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the same general trade as the manufacturer or producer of the particular merchandise under consideration.

The affidavit, Exhibit 7, states that the items "Raw materials" and "Wages" include the cost of materials, of fabrication, manipulation, or other process employed in the manufacturing or producing of the matches, and that the item "Salaries, office and factory expenses," etc., includes the usual general expenses incident to the production of the matches.

Exhibit 3 is an affidavit by one Jules Gourary, who states therein that he is the leading partner of one of the companies producing matches in Austria, and that during the year 1929 the company's profit was 6¼ per centum of its cost of production, and for the year 1930 its profit was 6½ per centum; that these were the usual percentages of profit for his company, and that deponent believes others engaged in the same business earn profits at practically the same rate.

Exhibit 4 is an affidavit by Dr. Friederich Meyer; he states that he is the manager of another of the companies manufacturing matches in Austria, and that in 1929 the net profits were 6 per centum of the cost of production, and for the year 1930 the net profits were 6½ per centum of the cost of production, and that deponent believes others engaged in the same business earn profits of practically the same rate.

The trial court, with the exception hereinafter noted, accepted the costs of production set out in Exhibits 1 and 7 covering raw materials, wages, salaries, office and factory expenses, etc., amounting to 180.36 Austrian schillings for the year 1929 and 207.58 Austrian schillings for the year 1930, per 10,000 boxes. Inasmuch as the affidavit, Exhibit 7, states that the cost of containers was included in the items "Raw materials" and "Wages" for each of the years 1929 and 1930,

and that the cost of such containers did not exceed 13 Austrian schillings per 10,000 boxes, the trial judge deducted 13 Austrian schillings from the sum of the items of "Raw materials" and "Wages" for each of said years, and thus found the costs enumerated in paragraph 1 of said section 206. He accepted the figures of general expenses set out in said affidavits. He then added 13 Austrian schillings per 10,000 boxes for cost of containers, etc., being the same amount which he had deducted from the sum of the cost of materials and wages set out in the affidavits. He then added 15.57 Austrian schillings per 10,000 boxes for profit, in accordance with paragraph 4 of said section 206, which provides that there shall be an addition for profit not less than 8 per centum of the sum of the amounts found under paragraphs 1 and 2 of the section.

There is some substantial evidence in the record that the profit ordinarily added by manufacturers of matches in Austria is less than 8 per centum of the sum of the amounts found under said paragraphs 1 and 2 of said section, and therefore the trial court properly added 8 per centum as the statute provides. As hereinbefore stated, the result of the findings by the trial court was a cost of production of 193.75 Austrian schillings per 10,000 boxes for the year 1929, and 223.15 Austrian schillings per 10,000 boxes for the year 1930.

The appellate division approved these findings of the trial court. The Government contends that the affidavits respecting costs of production present mere conclusions upon the part of affiants, and hence should be given no weight. It is sufficient to say that each of the affiants was actively connected with the match industry in Austria, and the weight to be given to the affidavits was exclusively a matter for the determination of the lower courts.

This is not a case where all the facts upon which the conclusions are based are set out in the affidavits, and hence our decision in the case of *Jenkins Bros.* v. *United States*, 25 C. C. P. A. (Customs) 90, T. D. 49093, has no application here.

The Government also contends that the costs of production set out in the affidavits and found by the lower courts do not include any item for selling expenses of the matches, and that in order to arrive at a constructive foreign market value this is necessary.

It is sufficient upon this point to say that section 206 refers only to cost of production, and nothing is said therein respecting selling expenses. Moreover, if the definition of "cost of production" in said section should be held to include selling expenses, the Government cannot consistently urge that the affidavit, Exhibit 7, stating that the general expenses therein set forth "includes the usual general expenses incident to the production of these matches" does not include selling expenses.

Therefore, whether costs of production under section 206 should be held to include selling expenses of merchandise need not be here determined, for, should it be held that the statute contemplates their inclusion in the term "cost of production," as being within the common meaning of the term "cost of production," then there is some substantial evidence in the record that the item for general expenses set forth in Exhibit 7 includes all expenses incident to cost of production.

We think there is substantial evidence in the record to support the findings of the appellate division, and we find no error of law in its decision.

For the reasons stated, the judgment appealed from is *affirmed.*

### CONCURRING OPINION

GRAHAM, Presiding Judge: I agree with the conclusion reached by the majority of the court in this case.

The only apparent necessity for my nonconcurrence in all that has been said, arises from the comment about the restricted market in Austria, and especially with reference to the comment upon the case of *United States* v. *Michele Diagonale*, 22 C. C. P. A. (Customs) 517, T. D. 47497. It is stated in the opinion of the majority that if the only point here involved was that the price was fixed by the selling agency, then the *Diagonale* case would have been applicable and a foreign value would have been established. It is true that the majority of this court so held in that case. In other words, it was established by this court by that decision that a controlled price fixed by a monopoly in a foreign country, although the price of the commodity sold be fixed absolutely and is noncompetitive, nevertheless comes within the definition which our statutes have made for the term "foreign value."

I dissented at that time, and am still in dissent about the underlying principle involved in that decision. I think it was a departure from the principles which had, up to that time, governed the administration of our customs laws. So, in this case, even were the matches in question freely offered to all purchasers in the ordinary course of trade, I would not be able to concede that there was a free open market, and an established foreign value for them shown by this record. I still arrive at the same conclusion as to the determination of the issues, but desire to keep my record clear on the fundamental principle involved, which I think is extremely important.