## United States v. Wool Novelty Co., Inc.

No. 7731.—

Entry Nos. 758204 and 720384.

### Third Division, Appellate Term

(Decided August 15, 1949)

*David N. Edelstein*, Assistant Attorney General (*Guy Gilbert Ribaudo*, special attorney), for the appellant.

*Siegel, Mandell & Davidson* (*Sidney Mandell* of counsel) for the appellee.

Before Cline, Ekwall, and Johnson, Judges; Johnson, J., not participating

Cline, Judge: This is an application for review of the decision and judgment of the lower court (*Wool Novelty Co., Inc.* v. *United States*, 21 Cust. Ct. 265, Reap. Dec. 7600), wherein it was held that certain amounts described on the invoices as buying commissions were not properly part of the dutiable value of the merchandise.

The merchandise consists of cotton and wool tapestries exported from China in March and September 1941. At the trial plaintiff limited its contention to the claim that the amounts stated on the invoices to be buying commissions were not properly a part of the dutiable value. In reappraisement No. 141784–A, the buying commission is 10 per centum and the claim is limited to the merchandise contained in cases 825 to 828, inclusive. In reappraisement No.

145879-A, the buying commission is 5 per centum and applies to all the merchandise covered by the invoice.

At the trial, Julius Rottenberg testified that he has been the general buyer for the importing company for 20 years; that he had been in China at various times and was there from January 8, 1941, to November 26, 1941; that he supervised the purchase of the merchandise involved herein; that he made arrangements with H. L. Gibson & Co., Ltd. (hereinafter called Gibson), for the purchase of the merchandise covered by reappraisement No. 141784–A and with Ling & Wang for the purchase of the merchandise covered by reappraisement No. 145879–A; that Gibson acted as buying agent for the importer, placed orders with various manufacturers, supervised the manufacture of the merchandise, examined it, saw that it was properly marked, packed and shipped it, and prepared all the necessary documents; that as a commission, Gibson received 10 per centum of the first cost of the merchandise, plus packing charges, cartons, paper, cloth used in wrapping the bundles, and a charge for stamping "Made in China" and the pattern number on each piece of tapestry; that the relationship of the importer with Ling & Wang was the same as that with Gibson.

The witness described the manner in which the purchase arrangements were made as follows:

I would come into Gibson's office and say, "I want to buy some tapestry today, and I have some samples here, and these samples haven't been made before. I would like to get an idea as to price." He would say, "O. K., leave the samples here and I will turn them over to the manufacturer and have him quote a price." A week or two later he would call me up, or I would go to his office, and he would say, "Be here tomorrow. The manufacturer will be here and wants to meet you." The Chinese would come in, and my commissionaire, who spoke English and Chinese, he would quote the prices, and I would either agree with his price, or we might argue about prices, and I would say the prices are ten or twenty per cent too high, and then we agreed on a price. He would tell the manufacturer, "O. K., you are going to get the order." At that time the manufacturer might say to Gibson, "I am having difficulty in getting wool. Can you help me?", or he might say, "I am having difficulty in getting canvas", and if Mr. Gibson was in a position to supply it to him, he would do so, and that was the entire transaction.

The witness stated that where the manufacturer was a small concern, Gibson sometimes purchased the canvas, wool, or other materials in order to facilitate business; that when dealing with a manufacturer who was not too dependable, Gibson would also cut the canvas to make sure no mistake was made in the size; that Gibson and other commissionaires each had a few mills that they did business with; that orders were placed by Gibson for the importer's specific account; that a letter of credit was then established for Gibson, who paid the manufacturers upon delivery.

Mr. Rottenberg also testified that he was familiar with market conditions in Shanghai at the time these goods were exported by reason of his contacts with the commissionaires and the manufacturers; that he was offered merchandise of this character by various manufacturers directly and through the commissionaires; that he submitted the same patterns to three or four different people in order to compare prices; that the prices were fairly close, within a couple of Chinese pennies; that the invoice values were representative of the market values at the time of shipment; that he could have purchased so-called spot merchandise (goods made by a manufacturer without a specific order) at a lower price than he paid for similar goods made to order.

Defendant introduced into evidence, as defendant's collective illustrative exhibit 1, a series of letters from Gibson to the importer. Although they were all written prior to the dates of the orders for the merchandise involved herein, they were offered for the purpose of showing the relationship between the importer and Gibson. The witness Rottenberg testified that the relationship between the two was the same in 1941 as in 1940. The correspondence indicates that Gibson purchased and cut the canvas for the merchandise referred to therein. The letters also contain statements similar to the following:

We are equipped to handle all types of Tapestry work but for the reasons explained in a previous letter, we are not prepared to switch our workers from the Continental stitch to a cheaper stitch, no matter how large your requirements might be for the latter. It would entirely disorganisze [sic] our productions for our other clients who, admittedly, only place business with us on sizes 18″ square and upwards with much heavier designs. (Letter of August 23, 1940.)

Further deliveries of your Tapestries have been received today from *our factory* and these will be despatched to you by the next outgoing steamer. (Letter of November 5, 1940.)

Defendant claims that this correspondence shows that Gibson was a partial manufacturer of the merchandise and had a greater interest therein than that of a buying agent. However, it appears from the testimony of Mr. Rottenberg that each commissionaire had a few mills with which he did business, so that the words in the correspondence, "our factory," "our workers," and "our productions," may be construed to refer to the manufacturers employed by Gibson. There is no statement in the letters nor is there any other evidence that Gibson actually owned and operated a factory. The most that Gibson did was to occasionally purchase materials and cut the canvas.

The only issue is whether the amounts described in the invoices as buying commissions formed part of the dutiable value of the merchandise under section 402 (d) of the Tariff Act of 1930.

It has been held that where an importer could buy directly from the seller without the intervention of a third party, but chose to employ an agent to whom he paid a commission, such commission constituted

no part of the dutiable value. *United States* v. *Enrique Vidal Sanchez,* 15 Ct. Cust. Appls. 443, T. D. 42642; *United States* v. *Alfred Kohlberg, Inc.,* 27 C. C. P. A. 223, C. A. D. 88. "The test to be applied in determining the dutiable status of an item of commission is whether or not the merchandise is freely offered for sale to all purchasers in the ordinary course of trade in the home market at a price not including the commission." *United States* v. *Henry Pollak, Inc.,* 67 Treas. Dec. 1420, Reap. Dec. 3554.

In the instant case there is evidence that the importer could have purchased similar merchandise directly from the manufacturers; that offers were made to the witness Rottenberg while he was in China both at his office and through commissionaires; that such offers were made in the usual course of trade in wholesale quantities at prices not including the commission; and that the unit invoice prices represented the prices at which such offers were made. The commissions, therefore, are not a part of the market price of the merchandise, but were paid for the handling of the goods.

In *United States* v. *Alfred Kohlberg, Inc., supra,* it appeared that the merchandise was purchased through commissionaires who inspected the merchandise, rejected defective goods, advanced money to the sellers on behalf of the principal, and, when necessary, laundered and repacked the goods. It was held that the amounts paid these agents were buying commissions and formed no part of the dutiable value. It has also been held that a buying agent may place work with dealers and workers, advance funds for securing material, compare goods with samples, purchase cases, and pack and ship the merchandise. *United States* v. *Case & Co., Inc.,* 13 Ct. Cust. Appls. 122, T. D. 40958; *United States* v. *Kresge & Co. et al.,* 26 C. C. P. A. 349, C. A. D. 39; *Stein* v. *United States,* 1 Ct. Cust. Appls. 36, T. D. 31007.

In the instant case Gibson also sometimes purchased and cut the canvas, but this was done as an accommodation to small manufacturers or to make certain that the proper-sized canvas was used. There is no evidence that Gibson had any interest in the goods other than its commission.

It is clear from the record that the amounts paid to Gibson were buying commissions and not a part of the purchase price of the goods. It is well settled that a buying commission is not a proper part of dutiable value. *Stein* v. *United States, supra; United States* v. *Kresge & Co. et al., supra.*

As to reappraisement No. 145879–A, it appears that the goods there involved were purchased by Mr. Rottenberg from Junkee Co. and were turned over to Ling & Wang to act as shippers, examiners, and packers. For these services they received a 5 per centum com-

mission instead of a 7½ or 10 per centum commission. Such commissions were no more than buying commissions and formed no part of the dutiable value of the merchandise.

We hold, therefore, that the proper dutiable export value of the merchandise contained in cases 825 to 828, inclusive, covered by reappraisement No. 141784–A is the appraised value, less 10 per centum purchasing commission, and the proper dutiable export value of the merchandise covered by reappraisement No. 145879–A is the appraised value, less 5 per centum purchasing commission. The judgment of the court below is affirmed.