BATTEN & Co. v. UNITED STATES (No. 1378).[1]

1. DURESS.

The importer may, in view of possible subsequent proceedings, register with his entry his claim as to the true valuation, and for the collector to refuse this privilege might be duress. But to constitute duress the proof must show a substantial right had been denied.

2. IBID.

In the case here there is no evidence that the goods are ever sold in the open markets of the country of exportation at less than the price including the com-

[1] Reported in T. D. 34975 (27 Treas. Dec., 589).

mission in controversy, and the requirement that this should be added to make market value was not to deprive the importer of any substantial right. The requirement, accordingly, did not constitute duress.

United States Court of Customs Appeals, November 27, 1914.

APPEAL from Board of United States General Appraisers, Abstract 34856 (T. D. 34201).

[Affirmed.]

*Allan R. Brown* for appellants.
*Bert Hanson*, Assistant Attorney General (*Charles E. McNabb*, assistant attorney, of counsel), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, AND MARTIN, Judges.

DE VRIES, Judge, delivered the opinion of the court:

Appellants for many years have been importers of certain woolen, worsted, and other dress goods at the port of New York from Bradford, England. Their appeal here concerns certain alleged commissions claimed to have been paid by the New York firm to so-called brokers in this class of goods in the country of exportation. The evidentiary facts in the case disclose that the goods were purchased from these so-called brokers, but could not be bought from the manufacturers or others. The issue principally argued at the hearing and in the briefs is a claimed duress exercised by the collector requiring the importers to make their entry in a prescribed form. It appears that in the early stages of the controversy the importers through their broker appeared at the customhouse with their entry, noted upon which were the words "add 2½ per cent commission." This entry was rejected by the collector's office and was thrown out into what is known as the entry error box. Thereupon the matter was taken up with the chief clerk of the entry division of the customhouse, who advised the importers through their broker that such entries would not be accepted; that the only entry that would be accepted would be in substance "add 2½ per cent to make market value." Thereupon and thereafter the importers followed the course thus directed by the chief clerk of the entry division at the customhouse. While there may be natural minor differences as to the precise occurrences and language used, there is no question in the mind of the court that the record fairly discloses that the importers in good faith endeavored to inscribe upon their entry the words "add 2½ per cent commission" for the purpose of, as they supposed, saving their rights in future proceedings, and that the said clerk refused to accept such entries and accepted only those written as he directed.

If this were the only controlling issue in the case we would be inclined to hold that, within the previous decisions of this and the Supreme Court of the United States, this action upon the part of the collector constituted duress as to the controlled action of the import-

ers. What constitutes duress upon behalf of public officials has been so thoroughly discussed by this and the Supreme Court that it needs here no extended elaboration.

The facts of this case in the particulars relating to the transactions of the respective parties at the customhouse are almost identical with the facts in Stein *v.* United States (1 Ct. Cust. Appls., 36; T. D. 31007; 1 Ct. Cust. Appls., 478; T. D. 31525). The Supreme Court of the United States in Robertson *v.* Frank Bros. Co. (132 U. S., 17), speaking to the subject of what constitutes duress in such cases upon the part of a public official, said:

> In our judgment the payment of money to an official, as in the present case, to avoid an onerous penalty, though the imposition of that penalty might have been illegal, was sufficient to make the payment an involuntary one. It is true that the thing done under compulsion in this case was the insertion of the additional charges upon the entries and invoice; but that necessarily involved the payment of the increased duties caused thereby, and in effect amounts to the same thing as an involuntary payment.

In an earlier case, Maxwell *v.* Griswold *et al.* (51 U. S., 10 Howard, 241), which also related to controlled actions of an importer in making an entry, took the same position.

This court in Van Ingen & Co. *v.* United States (4 Ct. Cust. Appls., 320; T. D. 33520), epitomized the doctrine of duress in such cases in the following language:

> Had the collector forced the importers to include in their entry admissions which they did not desire to make, or had he refused to receive their entry unless they excluded from it declarations which they deemed it proper to include for their protection in case of dispute as to the duties imposed, some claim of duress might have been made within the reasoning of Stein *v.* United States (1 Ct. Cust. Appls., 36; T. D. 31007), and of Stein *v.* United States (1 Ct. Cust. Appls., 478; T. D. 31525). Such conduct on the part of the collector might amount to an illegal exaction under color of official authority, and as possession of the goods was dependent on compliance, duress might well be asserted.

The language in N. Erlanger, Blumgart & Co. *v.* United States (154 Fed., 949) is in principle here applicable. The court there said:

> The appraisers can not include in their valuation some improper item, such as ocean freights from the foreign country to the United States, and cut off all inquiry as to their action by merely inscribing on the entry a statement that they added the item "to make market value."

So here the collector had no right to so control the action of the importers in making their entry that the importers could not there register their supposed rights in a manner that would enable them to avail themselves thereof in subsequent proceedings. If the importers wished in a reasonable way to record upon their entry the character of an item included thereupon that its nature might more plainly appear, or, particularly, that it might be so noted that they would not thereby be precluded from afterwards showing its true character, or would not thereafter be precluded by the law from

insisting that it was not a dutiable item or not a part of market value, we can not conceive of the validity of any action or regulation which would deny them absolutely this right. It follows that where the collector, however actuated, refuses to the importers that privilege, at least in a reasonable manner as was here attempted, such refusal upon the part of the collector within the decisions quoted would amount to duress. The existence of such duress, however, will not entitle the importer to relief unless it is shown by the record that in the last analysis it deprived him of some substantial right. Such does not here appear to have been the case.

Primarily this record does not satisfactorily make clear that the commission here claimed was a nondutiable one, at least in its entirety. Herein this case differs from the Stein case, *supra*. In that case the board made a finding "that the services rendered by the commissionaire, which were assumed to be paid by the 2½ per cent, were the legitimate services of the commissionaire, and the payment for same was commissions, which were not dutiable." This finding was accepted by the court as true for the purposes of those cases.

The facts as related by Mr. Batten of the importing firm may be delineated by the following excerpts from his testimony:

Q. Are you familiar with the nature of this 2½ per cent commission that was put on these?—A. I am, perfectly.

Q. For what service was that 2½ per cent paid? (Objected to as immaterial and irrelevant; objection overruled; exception.)—A. That we paid to the commission house in Bradford for the execution of our business, order the goods, examine the goods to see that they were right. We had no means of telling whether before we paid the duties and got them in our store whether they were all right, but *we were obliged to buy the goods through the commission houses* and *these commission houses* charged us this commission for that service alone.

Q. They placed the order for the goods for you with the manufacturer?—A. Yes, sir.

Q. After placing the order what do they do?—A. They place it with the manufacturer, get the goods in the gray, then place them with the dyer and finisher, then examine the goods very carefully to see that they are all right, and if they are not right they reject them; and for that they charge us 2½ per cent commission.

\*          \*          \*          \*          \*          \*          \*

Q. I understood you to say in the course of your remarks that you were obliged to buy your goods through the commission house. Is that right?—A. That is correct, because *I could not buy direct from the manufacturers.*

Q. There is no choice to you but to buy them in this way through the commission house?—A. No other way I could get my goods.

Q. At the time you bought them through this commission house I suppose you gave them this compensation of 2½ per cent for their trouble and time as you have stated?—A. Yes, sir.

Q. How long has that been true to your knowledge, Mr. Batten?—A. Well, for twenty-odd years and over.

\*          \*          \*          \*          \*          \*          \*

(By Judge WAITE.) Q. You say your agents get them in the gray from the manufacturer and then take them to the dyer and he dyes and finishes them and brings them to you in pieces folded up, does he?—A. Yes.

Q. And your agent examines them, throws them over a line and examines them, marks the defects, then rolls them up again and packs them? Does this 2½ per cent pay for the services?—A. No, sir; that is all included in the first cost of the goods to us. There is a 2½ per cent extra commission.

Q. All these things I have mentioned can not be from the manufacturer, because he is a different man than the man that dyes the goods?—A. The man who I buy the goods of has the price of the manufacturer in the gray cloth and also the dyeing price and all other costs, what it cost, the piece of goods made up.

Q. *Is that the man you pay the commission to?*—A. *That is the man.*

Q. That sells them to you?—A. Yes; that is the man.

Q. The same man you pay the commission to is the man from whom you buy the goods?—A. Yes; we did on those.

Q. We are talking about what you paid at that time?—A. Exactly.

Q. You knew the condition at that time?—A. Yes; when I was in business for myself.

(By Mr. ROBERTSON.) Q. *The same person you paid the 2½ per cent to is the person from whom you bought the goods?*—A. *Absolutely.*

(By Mr. STRAUSS). Q. You bought the goods in their finished condition at a fixed price and you paid him the 2½ per cent for the examination in addition?—A. Yes; the price includes all made up ready for shipment.

It is not exactly clear from the record that the commission does not include the service of supervision of the dyeing at least. In this respect the record is unsatisfactory. The goods are taken in hand by the commissionaire in the gray, by him taken to the dyer and there dyed, presumably according to his instructions and specifications and subject to his approval. This suggestion, however, is made more in the nature of a query which could only be satisfied by a more definite exposition of the facts by the record.

It does here appear, however, conclusively that these goods can not be purchased other than of the commissionaires, that they can not be purchased of the manufacturers, that they can not be purchased at a price less than that paid these commissionaires including the commission. This is the only evidence in the record as to the actual market value of these importations in the country of exportation. There is at least no evidence before us showing that the goods are ever sold in the open markets of the country of exportation at less than the price including this commission.

Actual market value is defined by the several provisions of the customs administrative law and the decisions of the Supreme Court of the United States to be "the price at which the merchandise is freely offered for sale to *all purchasers* in the particular markets of the country of exportation in the usual wholesale quantities, the price which the manufacturer or owner would have received, and was willing to receive, for such merchandise when sold in the ordinary course of trade in the usual wholesale quantities." The evidence in this record discloses that the only price at which these goods could be purchased by all comers, the only price at which they were freely

offered for sale in the usual wholesale quantities in the markets of the country of exportation, was and is the price paid by these importers to the commissionaires, including the 2½ per cent commission. It would seem, therefore, conclusively established for the purposes of this case that the claimed 2½ per cent commission was not a nondutiable item of commission but was in fact a part of the actual market value of the goods.

A very similar case as to the facts and the applicable law was that decided by the United States Circuit Court of Appeals, Second Circuit, in United States *v.* Herrman *et al.* (91 Fed., 116). The facts and conclusions of the court are epitomized in the syllabus as follows:

> The evidence showed that manufacturers were accustomed to sell in a foreign market to others than commission men at a fixed price, including in the price an item which they called "commission." The item so charged was the discount which the manufacturers were accustomed to allow commission merchants who purchased direct from them. There was evidence that, in buying goods of a concern which was a manufacturer and also a commission house, the price of the goods purchased of them was the same as for those of their own manufacture and for similar goods manufactured by others which they were selling on commission. *Held,* that the customhouse officers, in appraising the goods, should properly include as a part of the actual manufacturing price the entire sum paid by the importers to the commission men or the manufacturers, no part of which was properly chargeable as a commission.

The principle of law invoked, as stated with approval by the court, in support of the claim of the nondutiability of such commissions was as follows:

> A commission paid by the importer to his agent for services in procuring, forwarding, or caring for the goods is an item quite independent of the wholesale price of the goods at the market where they were bought. It may, and generally does, constitute an element of the cost of the goods to the importer; and, in exceptional cases, may of the market value. Muser *v.* Magone (155 U. S. 240; 15 Sup. Ct., 77).

It seems in that case, as is really the fact in this, the claim was made for a commission for a man selling his own goods. The commissionaires in that case were allowed by the manufacturers 5 per cent and the board had allowed them 2½ per cent. After discussing the principles of actual market value and wholesale price and nondutiable commissions in a careful and well-studied opinion the court concluded:

> It is not a violent presumption that the price actually paid by the importer to those of whom he buys goods in a foreign market, the price which he is willing to pay and freely pays, is the average market price, and not one 5 per cent higher; and if the appraisers, instead of adding to the invoice price 2½ per cent as an item "improperly deducted as commission," had added 5 per cent, they would have been quite justified in doing so by the evidence. The evidence before the Board of General Appraisers impresses us with the conviction that the item of "commissions," so called, is not entitled to cut any figure in the case, except as a trade device to mislead the customs officers and be made the basis of a claim for a reduction from the real wholesale price.

We are of the opinion, therefore, on the facts here, that while in a proper case the actions of the collector might have resulted in a

deprivation of the substantial rights or privileges of the importer and have amounted to remediable duress, in this case, irrespective of whether or not there was duress, the importers have suffered no substantial or other deprivation of rights.

*Affirmed.*