UNITED STATES *v.* ENRIQUE VIDAL SANCHEZ (No. 3001)[1]

United States Court of Customs Appeals, March 13, 1928

*Charles D. Lawrence*, Assistant Attorney General (*John F. Kavanagh*, special attorney, of counsel), for the United States.

*John R. Rafter* for appellee.

[Oral argument December 14, 1927, by Mr. Kavanagh and Mr. Rafter]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

This is an appeal in a reappraisement matter. The facts, as shown by the record, are these:

In the year 1923 the city of San Juan, in Porto Rico, proposed to install an aqueduct and for that purpose received and opened, on August 15, bids for certain cast-iron pipe and fittings therefor. Enrique Vidal Sanchez, the appellee, was considered the successful bidder and was awarded the contract to furnish said pipe and fittings, this contract being executed by appellee and the city on August 25, 1923. The amount of material to be furnished under this contract and a supplementary contract was quite large, the total paid to appellee thereon amounting to $938,652.79. Some eight or nine months before the letting of said contract, the appellee went to one Miguel Ferrer, an engineer, located in the city of San Juan, whom appellee was informed was acquainted with the Compagnie Generale des Conduites d'Eau, of Liege, Belgium (which will be hereinafter referred to as the Belgian company), makers of cast-iron pipe, and from that time until the time of the execution of the contract between appellee

and said Belgian company conducted his business with said company through said Ferrer. Appellee had communicated with said Belgian company, through Ferrer, before he made his bid to the city of San Juan, and was acquainted with the price at which he might purchase the material in question. Miguel Ferrer, at the time of these negotiations, was not the official agent of the said Belgian company, and was not so constituted, in respect to these transactions, until August 28, 1923, when he was given a power of attorney therein by it. On August 31, 1923, the appellee and the Belgian company, by Ferrer, entered into a written contract for the purchase and delivery of the pipe and fittings in question. It definitely and clearly appears, from the uncontradicted statement in the affidavit of Henri Doat, one of the managers of the Belgian company, that the appellee might have purchased the imported materials directly from the company without the intervention of Ferrer, in which case there would have been no commission to pay, and the contract price would hav been reduced by the amount of the commission paid to Ferrer by said company, namely, 3 per centum.

The contract price agreed upon between appellee and the Belgian company was $48 for each 1,000 kilos for the pipes, and $70 for each 1,000 kilos for the accessories and special parts. All these parts were to be made according to the specifications of the contract between appellee and the city. They were to be delivered on the pier in the city of San Juan by appellee, all breakage in transit and during unloading being assumed by the Belgian company. The appellee, in making this contract, insisted upon a contract price in dollars, refusing to become liable to any losses which might be caused by a fluctuating exchange.

In transacting his business with the city appellee did so through the Royal Bank of Canada, at San Juan. This bank made all the payments to the Belgian company and guaranteed the contract of appellee with said company. For this service said bank charged and received a commission of 1 per centum of the amount paid to the Belgian company for handling the money and $2\frac{1}{2}$ per centum thereof for a guaranty of the contract. Whenever funds were received by appellee from the city on said contract they were deposited by him in said bank, and all payments of invoices were made by the bank.

When the pipes and fittings were imported they were entered at the contract prices of $48 and $70 per 1,000 kilos, and from the total thus arrived at the following charges were deducted, which were claimed to be nondutiable: (1) Ocean freight; (2) insurance against exchange, amounting to 6 per centum of the delivered price of the material; (3) marine insurance and war risk insurance, one-half of 1 per centum of such price; (4) insurance against breakage, 6 per centum of said price; (5) commission paid to Ferrer, 3 per centum of said price;

(6) packing and consular fees; (7) transportation from various factories to Antwerp, the place of exportation.

The local appraiser at San Juan accepted the invoice prices of $48 and $70 per 1,000 kilos, and deducted therefrom as nondutiable charges: (1) Transportation charges from factories to Antwerp; (2) ocean freight; (3) maritime and war-risk insurance at one-half of 1 per centum of c. i. f. prices; (4) consular fee. He then added a transmission tax of 1 per centum, and thus arrived at dutiable value. The importer appealed for reappraisement. The single justice, after a hearing, found that the importer, Sanchez, was the actual purchaser of the goods in question and that the following charges were nondutiable, to wit: (1) Consul fees; (2) cost of transportation from factories to Antwerp; (3) ocean freight; (4) insurance against breakage, amounting to 6 per centum; (5) one-half of 1 per centum for maritime and war-risk insurance.

Both parties applied for a review. On the hearing by the first division of the Customs Court, the judgment of the single justice was modified, the court making the following specific findings:

First. That the merchandise was purchased in Belgium at a specific price, namely, $48 per thousand kilos for the pipe, irrespective of size, and $70 per thousand kilos for the accessories and special parts.

Second. That this merchandise did not have a market value in Belgium for the reason that it was manufactured according to specific sizes and specifications.

Third. That therefore it did not have a foreign market value.

Fourth. That the transmission tax by reason of the merchandise not having a market in Belgium was not assessable against the sale price of the merchandise; that such tax was not part of the export value.

Fifth. That the price at which the merchandise was invoiced, entered, and appraised included therein certain specific charges, such as insurance against breakage and insurance against change.

Sixth. That the entered value equaled the export value of the merchandise on the date of shipment, from which should be deducted the following charges: Transportation from factory to Antwerp, ocean freight, marine and war-risk insurance, insurance against breakage, insurance against change, commission, consular fee, and transmission tax.

I therefore find that the export value is as stated above with the allowances mentioned.

From the resulting judgment the Government has appealed and contends here that the court below erred in the following particulars, among others:

1. In finding that the importer was the actual purchaser of the goods.

2. In not finding that the ostensible importer was in fact an agent of the shipper.

3. In denying the Government's motion to transfer the hearing to San Juan, Porto Rico, for further testimony, which ruling was excepted to by the Government.

4. In admitting in evidence, over Government's objection and exception, documents and testimony, R. 15, 16, 19, 25, 27, 40, 44, 64, 72, 105, 118, 136, 157, 158.

5. In granting to the importer a deduction of 6% for alleged insurance against breakage.

6. In granting to the importer a deduction of 6% for fluctuation in exchange.

7. In granting to the importer a deduction of 3% commission for selling expenses.

8. In not adding to the invoice value Belgium transmission tax of 1%.

These various alleged errors will be dealt with in the order above suggested. In doing so it will be borne in mind that, this being a reappraisement matter, this court may review the judgment of the court below on questions of law only. Sec. 501, Tariff Act of 1922. It is equally true that any material findings of fact made by the court below must be sustained if there be any substantial evidence in the record in support thereof. *United States* v. *Richard & Co.*, 15 Ct. Cust. Appls. 143, T. D. 48819, and cases therein cited.

It is first vigorously argued that Sanchez was merely the agent of the importer and was not the bona fide purchaser. Sanchez testified that he was the purchaser of the goods and that the Belgian company had nb part or share in his contract with the city and that he was in no way interested in the Belgian company. This was corroborated by the company's representative. While the importer may have been somewhat vague in his testimony about his financial transactions there was ample evidence to sustain the finding of the court below on this phase of the case.

It is claimed that error was committed in sustaining the single justice's refusal to transfer the hearing to Porto Rico. On the hearing, at the close of the testimony of the importer, the Government, through its counsel, made the following oral motion:

Mr. KAVANAGH. Exception. Now, we would move to have the case held open and transferred to San Juan, P. R. It has been stated here the Government has made a very thorough investigation of this gentleman's office and documents and records, and we would like to put on the stand the person who made that investigation to see what he found, with the privilege of course to retransfer to New York for Mr. Rafter to put in any further testimony and the Government also.

This motion was denied by the single justice. In making this motion, no showing was made by the Government as to what witnesses were available at Porto Rico, or as to the evidence which it was hoped or expected to obtain from them. It is practically the universal practice to require such a showing. *United States* v. *Schoonmaker et al.*, 93 Fed. 724. Also, plainly, if the motion may be considered in the same category as a motion for continuance, its allowance was discretionary with the trial court, and, as we believe no abuse of discretion is shown, a refusal to allow it is not error. *Sechrist* v. *Bryant*, 286 Fed. 456; *Dundee Petroleum Co.* v. *Clay*, 267 Fed. 145, cert. denied 255 U. S. 574; *Cox* v. *Hart*, 145 U. S. 376. In addition, under section 518, Tariff Act of 1922, the Board of General Appraisers (now

the United States Customs Court) is given power to establish rules of practice. Under Rule VI of said board, promulgated October 30, 1922, by authority of the act above cited, it was provided that regular calendars should be called by the board at Baltimore, Boston, Chicago Los Angeles, New Orleans, Philadelphia, Portland (Oreg.), St. Louis, St. Paul, San Francisco, and Seattle, and at such other ports as the president of the board might designate. This rule further provides that the said president "may order special hearings in classification and reappraisement cases at ports other than New York and those ports on the regular calendar when occasion requires." Rule XIII also provides: "All appeals in reappraisement cases determinable by one general appraiser will be assigned by the president of the general board for hearing and determination."

Nothing has been called to our attention which alters or detracts from the effect of the language above referred to. It therefore appears that if a pending reappraisement hearing is to be transferred to some other port than that specified in the original assignment, an order must be made by the president of the board (now chief justice of the Customs Court) to direct this. While, in actual practice, it may be the custom for each single justice to make such orders in hearings then pending before him, there does not seem to be any warrant therefor in the statutory provisions or rules applicable thereto. As a consequence, before the Government may assign error upon the refusal to grant a hearing at San Juan, it must show that it has applied to the chief justice for such a hearing. Having failed to do so, it can not be heard to complain. The business of the Customs Court is so extensive that disorder and inefficiency would quickly result if assignments of cases and places of hearing were not constantly within the control of some centralized authority within that court.

Complaint is made of the admission, over objections, of certain testimony and documentary evidence. Without an unnecessary enumeration of the portions of the record so objected to, it will be sufficient to say that we have given the same careful examination, and are unable to discover any reversible error in their admission.

Before discussing the remaining points, it becomes necessary to inquire what basis for valuation shall be used in obtaining the dutiable value of the goods in question, and what such dutiable value is.

The single justice held that the goods in question had an export value. In the statement in writing, or assignment of error, filed by the Government on application for review, as provided by rule 47 of the Customs Court, no error is assigned on this finding. In the similar assignment of errors by the importer, error is assigned thereon. The first division of the Customs Court, on review, affirmed this portion of the findings of the single justice. On appeal to this court,

no specific error is assigned by the Government upon this finding of export value, and no argument is made by either party that such a finding is not justified by the state of the record before us. We shall therefore assume that there is no controversy as to this point and that the goods in question, at the time of exportation, had an export value. This being true, the question then is: What is the export value, as shown by this record?

The single justice found that the selling prices of the goods in question in Belgium, at the factory, packing included, was 680.40 Belgian francs per 1,000 kilos for the pipes, and 1,080.40 Belgian francs per 1,000 kilos for the fittings. To this were added the various items in question in this case in order to make the contract price with Sanchez of $48 and $70 per 1,000 kilos, respectively, these dollar prices being computed on the basis of 22.07 Belgian francs to the dollar. It only remains to be determined whether such additions were dutiable or nondutiable items.

The statute thus defines export value:

(c) The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

The export value being thus defined, the question arises whether these items in controversy should be considered as a part of the "price * * * at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, * * * for exportation to the United States, * * * packed ready for shipment to the United States."

A charge of 6 per centum for insurance against breakage is claimed to be a dutiable charge and to constitute a part of the export value. It is shown by the record that the importer refused to become responsible for such breakage either in transit or in unloading, and required the Belgian company to make good his losses from that source. The record also shows that responsible insurance companies would have charged from 5 to 10 per centum for insurance against this risk and that the charge of 6 per centum would, under ordinary circumstances not repay the exporter for his losses by breakage. The fact that the exporter assumed its own insurance risk can make no difference. This is common commercial practice. There is ample evi-

dence in the record to sustain the finding of the court below in this respect and, therefore, said finding will not be disturbed.

The exporter estimated, as a part of his contract price, 6 per centum for insurance against losses in exchange, and this, the Government claims, is a part of the export value. It appears from the record, however, that the ordinary practice of the exporter is to sell in terms of the currency of Belgium and not in American dollars. At the time the contract was made, the importer insisted upon a contract price in dollars. The rate of exchange at that time was 22.07 Belgian francs to the dollar, but it was expected that, owing to the rehabilitation of the finances of Belgium, the value of the Belgian franc would thereafter, and during the life of the contract, rise, and the value of the exporter's American dollars, received on the contract, would become less. To insure against this, the Belgian company added 6 per cent to its delivery price. It is shown no insurance company would assume this risk and it is further developed that the charge made was not, in fact, large enough to compensate for the losses incurred on this account. The finding of the court below, in this respect, is supported by the record.

Error is assigned upon the failure of the court below to find the commission of 3 per centum paid to Miguel Ferrer to be a dutiable charge. As to this, it is argued that the courts have universally held commissions paid by a seller to its agent are a part of the selling price. While this may be generally true, the rule has its limitations.

This court had under consideration in *Batten* v. *United States*, 5 Ct. Cust. Appls. 447, T. D. 34975, a somewhat similar case. There it appeared that the importer was obliged to buy certain goods through certain brokers in the country of exportation and for which services the importer was charged and paid 2½ per centum commission. It was shown that the importer could not buy direct from the manufacturer and that the only way he could buy was by paying the commission in question. The court therefore held that the commissions constituted a part of export value. The court said:

It does here appear, however, conclusively that these goods can not be purchased other than of the commissionaires, that they can not be purchased of the manufacturers, that they can not be purchased at a price less than that paid these commissionaires including the commission. This is the only evidence in the record as to the actual market value of these importations in the country of exportation. There is at least no evidence before us showing that the goods are ever sold in the open markets of the country of exportation at less than the price including this commission.

Actual market value is defined by the several provisions of the customs administrative law and the decisions of the Supreme Court of the United States to be "the price at which the merchandise is freely offered for sale to *all purchasers* in the particular markets of the country of exportation in the usual wholesale quantities, the price which the manufacturer or owner would have received, and

was willing to receive, for such merchandise when sold in the ordinary course of trade in the usual wholesale quantities." The evidence in this record discloses that the only price at which these goods could be purchased by all comers, the only price at which they were freely offered for sale in the usual wholesale quantities in the markets of the country of exportation, was and is the price paid by these importers to the commissionaires, including the 2½ per centum commission. It would seem, therefore, conclusively established for the purposes of this case that the claimed 2½ per centum commission was not a nondutiable item of commission but was in fact a part of the actual market value of the goods.

In the case at bar the exporter testified that the importer could buy direct, if he cared to do so. This was contradicted, to some extent, by Assistant Customs Representative O'Neil in his report on the case. The court below is the judge of the credibility of these various witnesses and has found the fact to be as stated by the exporter. We are not at liberty, if we so desired, to review this finding of fact. Accepting the finding as conclusive, it appears that there was no reason, except his own convenience, why the importer insisted upon transacting his business through Ferrer. Had he transacted his business otherwise, his contract price would have been 3 per centum less and the exporter would have been saved this expenditure. It appears, therefore, that there is substantial evidence to sustain the court's finding that such commission is a nondutiable charge.

To sum up, the three items last above discussed are not such as, "in the ordinary course of trade," constitute a part of the export price of the goods in question. Each and all of them were occasioned by the unusual and extraordinary requirements of the importer. If he had been content to buy his goods as such goods were ordinarily sold for export such additional charges would not have been made. They were not a part of the ordinary export value, and hence can not be deemed dutiable.

Finally, error is assigned on the failure of the court below to add a transmission tax of 1 per centum. It is shown by the affidavit of Doat and conceded in the report of the assistant customs representative, O'Neil, that such tax is not collected upon goods exported from Belgium. Such tax is, therefore, not a part of export value.

The judgment of the court below is *affirmed*.