F. W. WOOLWORTH CO. ET AL. *v.* UNITED STATES

and

UNITED STATES *v.* F. W. WOOLWORTH CO. ET AL.

No. 5094.—Invoices dated Sonneberg, Germany, April 14, 1936, etc.
Certified April 15, 1936, etc.
Entered at Boston, Mass., May 5, 1936; New York, December 3, 1935; Baltimore, Md., August 1, 1935; Philadelphia, Pa., July 17, 1937; Houston, Tex., November 15, 1935; New Orleans, La., October 29, 1936; Seattle, Wash., August 26, 1936; Sumas, Wash., November 13, 1936; Portland, Oreg., July 19, 1937; San Francisco, Calif., May 25, 1937; Los Angeles, Calif., August 19, 1935; etc.
Entry Nos. 13878, 768666, 433, 591, 474–H, 1279, 1161, 273–K, 80, 12360, 1392, etc.

Second Division, Appellate Term

(Decided January 16, 1941)

*Sharretts & Hillis* (*Edward P. Sharretts* of counsel) for the importers.
*Charles D. Lawrence,* Acting Assistant Attorney General (*Dorothy C. Bennett* and *Daniel I. Auster,* special attorneys), for the United States.

Before TILSON, KINCHELOE, and DALLINGER, Judges

TILSON, Judge: This is an application for review of the decision of the trial court, reported in Reap. Dec. 4922, covering Christmas-tree ornaments and other glass novelties. As stated by the trial

court "This matter has already been elaborately litigated upon a large record." (See Reap. Decs. 4155 and 4310, and 26 C. C. P. A. 349, C. A. D. 39.)

In order that we may have a complete understanding of this previous litigation and its background, we quote the following from our former decision reported as Reap. Dec. 4310:

According to the record the issue in this case arose by reason of the fact that in October 1935 a special agent in Berlin reported to the Treasury Department that an interview with the manager of a local trade organization in Sonneberg indicated that an agreement existed between the association of manufacturers and the association of dealers or factors under which the manufacturer could sell Christmas-tree ornaments only to licensed members of the dealers or factors organization, i. e., that the manufacturers were selling in a restricted market.

The evidence of the plaintiff in this case, as well as the reports of the special agents, offered by the defendant, show that the agreement referred to was one that had been made in May 1934 between two private associations, and that both these associations were dissolved in 1934 by the National Socialist Government as a part of the program of reorganization of trade and industry. The Christmas-tree ornaments in this case were not purchased and exported until during the Fall of 1935, long after both these organizations had been dissolved by decree of the Government.

With reference to this phase of the case counsel for the Government stated in its brief before the trial court:

It would seem from the evidence that the admittedly restrictive agreement of May 2, 1934, was abrogated and nullified as a legal binding agreement by the dissolution of the old "Fachschafft" in October 1934, and the dissolution of the old "Verband" in December 1934.

We find that the record amply supports the above concession and in support thereof we quote only the following from exhibit DD:

Since the termination of the agreement on May 2nd, 1934, every maker of Christmas tree ornaments has a right to sell his merchandise without restriction to all customers at tariff prices or at higher prices. In the case of fancy glass articles, such as for instance, glass animals, birds, etc., every manufacturer had the right to sell his goods to anybody at any price, as no tariff for such has ever existed. These manufacturers were only obliged to adhere to the minimum scale of wages, and not to exceed the regulation number of working hours.

In this connection and for the same purpose the following from the opinion of the trial court in this case is quoted:

* * * The principal question contested was whether the sales of certain people who manufacture Christmas-tree ornaments, and other glass novelties, and cocktail sticks in their homes in the Sonneberg-Lauscha district of Germany, constitute the market for dutiable purposes, as claimed by the importers, their cash prices being the basis of the entered or claimed values; or, whether higher prices charged by certain commissionaires or factors, made on credit extended, was the proper basis of dutiable value. This latter was the basis of the advance made by the United States appraiser of about 30 per centum for the Christmas-tree ornaments, and about 25 per centum for the glass novelties, and about 60 per centum for the cocktail sticks.

*       *       *       *       *       *       *

The new evidence, not in the prior case which went to the Court of Appeals, shows that payments, in addition to the German Government's tariff minimum, must be made, or arranged for, in order to obtain deliveries of the Christmas-tree ornaments and glass novelties from the home manufacturers. They were

for social security and for vacation and holiday pay. That does not appear in the evidence in the incorporated case.

The last-quoted excerpts from the decision of the trial court will be referred to and treated later in this decision.

The Government has also filed a cross-appeal in this case in which it assigns, among other things, error in the failure of the trial court to affirm the appraised values; in holding that Mr. Michel was not qualified to testify as to the interpretation of the German laws concerning homeworkers; in failing to exclude certain evidence offered by the appellant herein; in excluding certain evidence offered by the Government; in holding that the explanation of a foreign law contained in a special agent's report was not admissible; in holding that it was unnecessary to decide whether or not the test of the German law has any bearing upon the dutiable value of this merchandise, and in holding that the importers herein and other American firms did not pay the additional 12½ per centum above German homeworkers' remunerations for the instant merchandise.

The record before us consists of 341 pages of the printed record in the case of the *United States* v. *Kresge*, 26 C. C. P. A. 349, C. A. D. 39, and 53 documentary exhibits in that case, consisting of special agent's reports and affidavits, etc., plus 337 pages of printed record in this case and 56 documentary exhibits, consisting of additional affidavits and special agent's reports, etc. We shall not attempt to give any detailed statement of all the evidence and the documentary exhibits.

While we are not entirely in agreement with all the rulings of the trial court on the admission or exclusion of evidence, both oral and documentary, we find that, as to such rulings as to which we may not be in entire agreement, the error, if any, was error without injury and, therefore, not reversible error. Therefore, the rulings of the trial court in admitting and excluding evidence are affirmed. As indicating our view on this point we refer to certain exhibits claimed to relate to the German labor law which the trial court admitted only so far as they state from authorized publications the German law itself. The trial court, however, immediately stated that:

In view of the conclusion which has been reached in this case it becomes unnecessary to decide whether or not the *text* of the German labor law itself has any bearing upon the dutiable value under our customs acts.

At the trial of this case ruling on the admission or exclusion of the majority of the documentary evidence was reserved by the trial judge and the same was marked for identification and final ruling thereon made in the opinion of the trial court. After this case was appealed to this Division the Government made a motion to have the case sent back to the trial judge for the purpose of settling the record as to the manner in which the clerk had certified the same to this Division. This motion was denied. In our consideration of this case we have

accepted the rulings of the trial court, either admitting or excluding these exhibits, and have considered the same in the exact status in which the rulings of the trial court in its decision, Reap. Dec. 4922, placed them, and have given no consideration to them as erroneously certified by the clerk.

The judgment of the trial court is as follows:

It is hereby ordered, adjudged, and decreed that the export value, as that value is defined in section 402 (d) of the Tariff Act of 1930, is the proper basis for the determination of the value of the merchandise here involved, and

It is further ordered, adjudged, and decreed that such values were the unit invoice prices, plus 10 per centum, plus 2½ per centum, plus outside packing as invoiced, plus 3½ per centum for social security payments on shipments made after January 1, 1938 when voluntarily added by the importer.

We are in agreement with the judgment as above set out insofar as it holds that the export value is the proper basis for the determination of the value of this merchandise, but we are not in agreement with the actual value found by the trial court, as set out above, reference being had particularly to that part of the judgment which includes an item of 10 per centum in the dutiable value. In our view this addition or inclusion is not justified by the record, or warranted under the applicable law.

As stated by the trial court "This matter has already been elaborately litigated upon a large record." In the prior case the trial judge, the appellate division, and the appellate court held that the proper dutiable export value of the merchandise was the manufacturers' list prices, plus 2½ per centum packing charges, and that the 10 per centum purchasing commission was a nondutiable item.

In the prior decision the principal question contested was whether the sales of certain people who manufacture Christmas-tree ornaments, and other glass novelties, and cocktail sticks in their homes in the Sonneberg-Lauscha district in Germany constitute the market for dutiable purposes, as claimed by the importers, their cash prices being the basis of the entered or claimed values, or, whether higher prices charged by certain commissionaires or factors, which included a 10 per centum buying commission, made on credit extended, was the proper basis of dutiable value. With reference to this principal question, as contested, the appellate court specifically held that the sales made by these home manufacturers were freely offered sales at the catalog prices, and that the involved and like merchandise was freely offered for sale to all purchasers in the principal markets of Germany, in the usual wholesale quantities and in the ordinary course of trade. These prices did not include a 10 per centum buying commission.

The trial court clearly recognized that the only new evidence in this case which was not in the prior case has to do only with certain social

security payments which have to be made, as shown by the following quotation from its decision:

> The new evidence, not in the prior case which went to the Court of Appeals, shows that payments, in addition to the German Government's tariff minimum, must be made, or arranged for, in order to obtain deliveries of the Christmas-tree ornaments and glass novelties from the home manufacturers. They were for social security and for vacation and holiday pay. That does not appear in the evidence in the incorporated case.

It is not quite clear just how the trial court tied up this item for social security and for vacation and holiday pay with the item of a 10 per centum buying commission so as to add that 10 per centum buying commission as a dutiable item. Particularly is this true when at no time has the social security and vacation and holiday pay ever amounted to more than 3½ per centum, and the trial court added this item of 3½ per centum on all shipments made after January 1, 1938. There is absolutely no connection whatsoever between the 3½ per centum social assessments, which only began on January 1, 1938, and the 10 per centum buying commission, added by the trial court, as an independent item to the freely offered for sale price.

We again quote from the trial court's decision as follows:

> Assuming that the houseworkers are manufacturers of Christmas-tree ornaments in the tariff sense, they have no stock, they do not advertise, and they must charge at least the amount of the German tariff to guarantee their own and their workers' remuneration as part of the Labor Front. And they must sell for cash alone, extending no credit, and make deliveries weekly.
>
> As frankly and fully stated by Mr. Dressel's testimony, the complications in making these purchases are enormous. The goods have to be ordered, manufactured from samples of considerable variety, and the particular houseworking manufacturer selected, who makes the particular ones ordered, with some care and detail. And on top of all that, certain complicated social security payments must be paid, or arranged by the purchaser, before he can procure delivery of the merchandise. In such circumstances the services of a commissionaire become necessary, indeed indispensable, to any one in America purchasing an export sale to this country unless he wished to remain in the district for months to perform the necessary acts as his own commissionaire.
>
> The modern protective tariff arrangements of the acts of 1922 and 1930 make the export sale govern, if higher. Consequently, it is rational to say here that the export value here is the homeworkers' German tariff price, plus 10 per centum commission, plus 2½ per centum for putting up and packing, which 12½ per centum is the price usually charged by the commissionaires for cash sales (without credit) for export to the United States, plus outside packing.

In the first place it is not necessary for us to assume that the house-workers are manufacturers of Christmas-tree ornaments in the tariff sense. The trial judge, this appellate division, and the appellate court in the prior case so held, and there is no additional new evidence in the instant case upon which to base a different finding. The trial judge, this appellate division, and the appellate court in the prior case held that although these houseworkers have no stock and do not advertise

and they must charge at least the amount of the German tariff, such sales were freely offered sales in the ordinary course of trade in the usual wholesale quantities in the principal markets of Germany, and there is no new evidence in this case upon which to base a different finding.

This social security law of Germany and the arrangements for making the payments to provide for the same are not entirely dissimilar to the social security law now in force in the United States whereby the employer and the employee are both required to make certain specified payments to provide for the same. And yet we never see these payments on the invoices of purchased merchandise. The purchaser never has to pay these assessments in addition to the freely offered price in order to obtain his merchandise. If one purchases $1,000 worth of merchandise he is required to pay $1,000, no more, no less, but included therein is the item of social security assessment.

This record clearly shows that for a number of years certain social security payments have been made in Germany, but not until January 1, 1938, when they amounted to 3½ per centum, were they ever added to or included in the purchase price of the merchandise, and the purchaser required to pay the same in order to obtain possession of his merchandise. Until such time as these social security payments were added to and included as an independent item as a part of the purchase price they were certainly not to be added to the freely offered price at which the merchandise was sold, because they were already included in such freely offered price.

Particular attention is invited to the holding of the trial court that these houseworkers "*must charge at least the amount of the German tariff to guarantee their own and their workers' remuneration as part of the Labor Front.*" There is nothing strange about this. The expenses to maintain the Labor Front had to be paid by some one, and, being paid by the manufacturers out of their freely offered for sale price of the merchandise, it was included in that price until January 1, 1938, and to add it as a separate item to the freely offered for sale price would include it a second time. This is clearly shown by the following quotation from collective exhibit 9:

(1) The insured persons and their employers have to pay contributions. (2) *The persons who are obliged to be insured and their employers pay the contributions, each of them half.* They who are insured voluntarily pay the entire contribution. [Italics ours.]

\*          \*          \*          \*          \*          \*          \*

The funds of the illness insurance are raised by premiums of the house industrialists and their employers.

\*          \*          \*          \*          \*          \*          \*

Regardless of the class into which the manufacturers of this merchandise fall, it quite clearly appears from the above that they have to pay their complicated social security, vacation, and holiday premiums

out of their own funds.  We have found nothing in the law which requires that the purchaser of the merchandise pay any of these assessments.  Of course, since these social security payments, amounting to 3½ per centum, have been voluntarily added by the importers since January 1, 1938, a different question is presented as to them.

That all these social assessments were taken care of by the employer and employee and that they were never charged to the purchaser as an independent item in addition to the freely offered for sale price of the merchandise, is shown by the following from exhibit 2, which is only one of some thirty similar affidavits:

I am engaged in the manufacture and sale at wholesale of blown glass Christmas tree ornaments.  I have been engaged in this business for 40 years.  * * .* During the years 1935, 1936, 1937, 1938, 1939 to date I have been selling the tree ornaments in wholesale quantities in the open market at the prices specified in the established price tariff.  My terms were always immediate payment upon the delivery of the merchandise at Lauscha or Sonneberg.  The official list prices at which I sell, are packed prices delivery charges prepaid to Lauscha or Sonneberg.

*          *          *          *          *          *          *

* * * I pay my employees the hourly wages fixed by law.  My selling price which in all cases is the list price, includes all of my overhead expenses, including the wages paid to my employees.  My only compensation is the difference between the overhead expenses, including wages and the cost of the materials and other manufacturing costs, and my selling price.  The profit varies according to business conditions, and averages from 10% to 12%.  I do not receive any wages from anybody in connection with the manufacture of Christmas tree ornaments. During the years above mentioned I have been selling the Christmas tree ornaments to various purchasers, * * *.  My prices in. all instances have been the prices specified in the official price tariffs.  None of the said purchasers or any other purchasers have at any time had any financial interest in my business. My. only relationship with said purchasers has been that of seller of the merchandise.

Since January 1st, 1938 I have been required by law to collect from purchasers social assessments in addition to the selling price of the merchandise.

There appears to be nothing unusual about the complications in making these purchases being enormous.  This seems to have been true in the case of *United States* v. *May*, 26 Fed. Cases, 1224, from which the following is quoted.

* * * *The articles in an assorted order or invoice are numerous.  They are to be purchased in small parcels, often at great distances, and frequently at no inconsiderable trouble.*  If the agent happens to be a dealer in one article, and to have that on hand, he charges his principal only with the manufacturer's price, and thus puts him upon the same footing, as if he purchased of the manufacturer. And in point of fact, as all the witnesses state, it is now rare, from the subdivision of labor, for a broker or agent to keep any hardware goods to sell to his customers upon their orders.  The commission of five per cent. on this invoice is the usual and lowest allowance.  *It is not doubted, that Mr. May has bona fide paid it, in the same manner, as all other merchants pay it.  If so, the court sees no reason, why it should not be allowed to him.*  [Italics ours.]

The fact that the circumstances surrounding the purchase of this merchandise were such as to make the services of a commissionaire necessary, or "indeed indispensable," and the fact that his duties might have been, or were, enormous, forms no basis whatsoever for holding the 10 per centum commission paid to be a dutiable item. Neither does the fact that in this case the appellant elected to have a commissionaire perform the above duties in the purchase of the merchandise and keep him there permanently for that purpose rather than "remain in the district for months to perform the necessary acts as his own commissionaire" form any basis for holding this 10 per centum to be a dutiable item.

· It is not our view that a business house in the United States should be penalized to the extent of 10 per centum of its purchase price because it had grown to such proportions that it required the exclusive full-time services of a commissionaire in the purchase of merchandise abroad, when if this same business house employed the same commissionaire under the same conditions for only 1 month, it would be permitted to import its merchandise without the inclusion of the 10 per centum commission as a dutiable item. Such does not appear to be the holding, intent, or purport of the law or of any of the authorities we have examined on the subject of commissions. It is to be assumed that the services of a commissionaire were at least desirable, if not necessary and "indeed indispensable." Otherwise he would not be employed at all. The fact that the commissionaire's duties are enormous in this case might well account for the fact that he received a commission of 10 per centum, instead of only 5 per centum, as in the *May* case, *supra*.

The fact that the modern protective tariff arrangements of the acts of 1922 and 1930 make the export sale govern, if higher, is no reason why that "consequently" the 10 per centum commission should be held to be a dutiable item.

The trial judge in this case, when deciding the case of *Cohen & Mann* v. *United States*, Reap. Dec. 4647, apparently was not of the view that because the modern protective tariff arrangements of the acts of 1922 and 1930 make the export sale govern, if higher, consequently the item of 5 per centum commission was a dutiable item. The following is quoted from the *Cohen* decision, *supra:*

The Government claims that the fact that he obtained by agreement with the manufacturer all the number so manufactured for distribution to his customers, so that all who bought this number would have to pay him 5 per centum of the landed New York price, makes it a seller's commission and, therefore, dutiable as part of the export value, none being sold in the home market of Poland. Upon this theory the contested appraisement is made.

With that legal conclusion, from the facts of record, I am unable to agree, but hold nevertheless that it remains a nondutiable buyer's commission.

The following statement by the trial judge,

That, apparently, is the price paid for every export sale to the United States except those, who, like the importers here, act as commissionaires for themselves through a subsidiary company operating a warehouse for that purpose in the German district.

is without any basis of fact in the record. The fact that one purchaser of merchandise elects to purchase through a commissionaire and pay him a 10 per centum commission for making the purchase, while another purchaser may elect to make his own purchases direct without the assistance of a commissionaire, does not operate to make the 10 per centum bona fide commission paid by the one purchaser a dutiable item in finding the proper value of the merchandise, and leave the value of the merchandise purchased by the other purchaser 10 per centum lower than the value of the merchandise purchased by the first purchaser.

We agree with the trial court that calling this commission a buyer's commission would not make it a bona fide buyer's commission, but the evidence in this case establishes that this 10 per centum commission is a bona fide buyer's commission and that it is actually paid by the importers in this case.

As heretofore stated, in the prior case, the appellate court held that the sales of merchandise such as or similar to that in this case, made by the manufacturers of the merchandise were sales and free offers for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, and there is nothing in this record which would require or justify any departure from that holding. When these purchases are made in the ordinary course of trade from these manufacturers there is no 10 per centum commission to be paid by any one. Certainly these manufacturers do not charge, nor do they receive, a 10 per centum commission, or any sum as a commission.

The evidence in this case that such sales as were made by the dealers for cash on delivery to retailers for consumption in Germany at the manufacturers' catalog prices, plus profits of 10 per centum, plus 2½ per centum packing charges, were fugitive and not in the ordinary course of trade in the principal markets of Germany, is even stronger than in the prior case, and, in view of this fact, we feel the decision of our appellate court is controlling on this point.

Likewise, the evidence in this case that in the ordinary course of trade in the principal markets of Germany the involved and like merchandise was sold for cash on delivery, and that such sales as were made by the dealers on credit were not in the ordinary course of trade, is more convincing in this case than in the previous case, and, on

this point, we again feel the decision of our appelate court in the previous case is binding.

One witness testified without contradiction that if the trial judge went to one of these manufacturers he could purchase this merchandise at the minimum tariff price, plus 2½ per centum for packing, and that he would not be charged the 10 per centum, or any commission. Therefore, to hold this 10 per centum commission to be a dutiable item would force these importers to pay duty on exactly 10 per centum more than the value or price at the time of exportation of such merchandise to the United States, at which such or similar merchandise was freely offered for sale to all purchasers in the principal markets of Germany, in the usual wholesale quantities and in the ordinary course of trade. This would be contrary to all the authorities on this point.

As supporting the above views we quote the following from the case of *United States* v. *Sanchez*, 15 Ct. Cust. Appls. 443, T. D. 42642.

In the case at bar the exporter testified that the importer could buy direct, if he cared to do so. This was contradicted, to some extent, by Assistant Customs Representative O'Neil in his report on the case. The court below is the judge of the credibility of these various witnesses and has found the fact to be as stated by the exporter. We are not at liberty, if we so desired, to review this finding of fact. Accepting the finding as conclusive, *it appears that there was no reason, except his own convenience, why the importer insisted upon transacting his business through Ferrer. Had he transacted his business otherwise, his contract price would have been three per centum less and the exporter would have been saved this expenditure.* It appears, therefore, that there is substantial evidence to sustain the court's finding that such commission is a nondutiable charge.

To sum up, the three items last above discussed are not such as, "in the ordinary course of trade," constitute a part of the export price of the goods in question. Each and all of them were occasioned by the unusual and extraordinary requirements of the importer. *If he had been content to buy his goods as such goods were ordinarily sold for export such additional charges would not have been made. They were not a part of the ordinary export value, and hence can not be deemed dutiable.* [Italics ours.]

When the pronouncements quoted above are applied to the facts in the instant case their controlling effect is immediately apparent with reference to the 10 per centum commission in this case. "In the ordinary course of trade," anyone purchasing from the manufacturer any of the merchandise in this case, would have been required to pay only the minimum tariff price, plus 2½ per centum for packing, and he would not have had to pay the 10 per centum, or any other commission. Because the importer in this case was not content to buy his goods as such goods were ordinarily sold for export, but insisted upon transacting his business through a buying agent, or commissionaire,. does not serve to make this 10 per centum commission a dutiable item.

Counsel for the Government quotes the following from the case of *Batten* v. *United States*, 5 Ct. Cust. Appls., 447, T. D. 34975, as support-

ing the contention that this 10 per centum commission is a dutiable item:

&ast; &ast; &ast; The evidence in this record discloses that the only price at which these goods could be purchased by all comers, the only price at which they were freely offered for sale in the usual wholesale quantities in the markets of the country of exportation, was and is the price paid by these importers to the commissionaires, including the 2½ per cent commission. It would seem, therefore, conclusively established for the purposes of this case that the claimed 2½ per centum commission was not a nondutiable item of commission but was in fact a part of the actual market value of the goods.

Under the facts in the *Batten* case, *supra*, we are in entire accord with the holding in that case that the 2½ per centum commission was a part of the actual market value of the goods. In the *Batten* case, *supra*, the merchandise could not be purchased by anyone without the payment of the 2½ per centum commission. In the instant case it is shown by competent evidence that anyone could purchase this merchandise in the principal markets of the country of Germany, in the usual wholesale quantities and in the ordinary course of trade, without the payment of this 10 per centum commission. This clearly distinguishes the commission in the *Batten* case from the commission in this case, and renders inapplicable to the present case any of the pronouncements made in the *Batten* case, *supra*.

With reference to this 10 per centum buying commission the trial court observed.

&ast; &ast; &ast; It becomes dutiable, in my opinion, when every importer has to pay it except those with branch houses in the foreign-market place or district.

As a general proposition of law we agree with the above statement, but in this case it is entirely inapplicable, because the evidence clearly shows that no one has to pay this 10 per centum commission if they are content to buy their goods as such goods are freely offered for sale to all purchasers in the principal markets in the ordinary course of trade. Of course if, for their own convenience, they elect to purchase through a commissionaire then the 10 per centum must be paid, but even this does not serve to make this 10 per centum a dutiable item in finding value. Therefore, a uniform duty would exclude it for all, not include it for all.

With reference to the buyer's commission of 10 per centum in this case being controlled by the decision in *Muser* v. *Magone*, 155 U. S. 240, the trial court stated as follows:

It thus falls into the category of the buyer's commission which was held part of the dutiable value in *Muser* v. *Magone* 155 U. S. 240, because all except those with branch houses in St. Gaul like Mr. Muser paid it. True, that commission included complicated work as does the commission here. The fact that in the *Muser* case, supra, it included also getting the gray goods dyed would not, in my opinion, differentiate it from the 10 per centum commission before me. Like it, it was not a seller's commission. It was a buyer's commission paid by all

purchasers f. o. b. St. Gaul, except those with branch houses, which branches, as here, performed the necessary complicated work of a commissionaire dealing with these Christmas-tree ornaments.

Commenting upon the above-quoted holding of the trial court, counsel for appellant states:

We do not believe it would be possible to compose a more erroneous concept of the law and facts of Muser v. Magone than is embodied in the above quotation from Judge Brown's opinion.

In the first place the item under discussion in Muser v. Magone was neither a buying commission nor a selling commission. The item discussed there was a so-called "manufacturer's profit."

In the *Muser* case, *supra*, the merchandise consisted of embroideries manufactured at St. Gaul, Switzerland. Plaintiffs maintained a branch house at that place. The cloth on which the embroideries were stitched was purchased in the gray state by the plaintiffs at Manchester and received in their warehouse at St. Gaul. It was then sent out to various parties at St. Gaul who had stitching machines and was stitched according to patterns or designs furnished by plaintiffs, which designs had either been purchased by them in Paris, or made in their St. Gaul establishment by designers employed by them. The goods when stitched were returned to plaintiffs' warehouse, and, having been examined by their employees to see if they were properly done, were sent out again to a bleacher, to be bleached. When bleached they were brought back to plaintiffs' warehouse, reexamined, cut into strips of suitable size for the American market, ticketed, boxed and shipped.

In the instant case none of the merchandise was purchased in a particular stage of manufacture at Manchester and received in appellant's warehouse in the Sonneberg-Lauscha District; none of the instant merchandise was sent out to certain parties who had certain machines to have certain work done upon it according to designs or patterns furnished by the appellants, which designs had either been purchased by them in Paris, or made in their Sonneberg-Lauscha establishment by designers employed by them; neither were these goods returned to the appellant's warehouse and examined by their employees to see if this work had been properly done and then sent out to another manufacturer to have other work performed upon it, and then brought back to appellant's warehouse, reexamined, and cut into strips of suitable size for the American market.

The facts in the *Muser* case, *supra*, and in the instant case so clearly distinguish the two cases that, instead of the *Muser* case, *supra*, being an authority for holding the 10 per centum commission to be a dutiable item in this case, it is ample authority for holding said commission to be a nondutiable item.

On each of the invoices before us the exporter has placed the statement "10% Commission." With reference to the effect of such a statement appearing upon an invoice, Judge Story, in the *May* case, *supra*, stated:

Where the invoice contains a charge of commissions in the usual cases, this is prima facie sufficient for the importer. If the charge is supposed to be wrong, the burthen (burden) of disproving it rests on the government. It is not to be presumed, that the importer will swear to a charge, that is known to him to be incorrect; and when he offers to take the usual oath as to his invoice, he affirms in the most solemn manner its genuineness and verity.

In the case of *Stein* v. *United States*, 1 Ct. Cust. Appls. 36, T. D. 31007, the Court of Customs Appeals said:

It appears that the principal duties of the commissionaire, for which this commission was paid, was to receive the goods after they had been manufactured and finished, unfold and compare them with the purchase samples, purchase the cases, and pack and ship the goods. Separate charges appear on the invoice for cases and packing. The commission would seem to be a service connected with the fulfillment of the contract, rather than a performance of any of its terms. It entered into the cost of the goods to the importer but did not become a part of their actual market value. We think the record fully supports the finding of the Board of General Appraisers that the 2½ per centum was a commission, pure and simple, and in no wise entered into the actual market value of the goods. It was therefore a nondutiable item. *Muser* v. *Magone* (155 U. S., 240); *United States* v. *Passavant* (169 U. S., 16); *United States* v. *Herman* (91 Fed. Rep., 116); *United States* v. *Kenworthy* (68 Fed. Rep., 904).

In the case of *United States* v. *Bauer*, 3 Ct. Cust. Appls. 343, T. D. 32627, Judge Montgomery, discussing generally the subject of commissions and the legislation dealing with the same, which decision was a reaffirmance of the *Stein* decision, *supra*, and referring particularly to section 19 of the act of 1883, said:

This section said nothing about commissions, and in view of the history of the legislation it is to be presumed that the omission of commissions was intentional. The question was raised shortly after this section was put into operation as to whether commissions were dutiable, and that question, having been referred to the Attorney General, it was held by him that they were not. When section 19 was before Congress, the report submitted by the Ways and Means Committee stated of section 19:

While it returns to the former legislation and will accomplish the desired purpose, it does not include as dutiable items charges for inland transportation, *shipment*, trans-shipment, *commissions*, brokerage, insurance, export duties, etc. as was provided in sections 2907 and 2908, Revised Statutes.

So it is clear that Congress, by the enactment of section 19 of the customs administrative act, did not intend to go back to the rule of imposing a duty upon commissions. The whole difficulty has arisen from a treatment of commissions as a part of the market value. But turning back to section 2907 it will be seen that the general market value was treated as a value not including commissions, and commissions were treated as something separate and distinct from the market value. It would seem like extending the statute, after Congress has made commissions nondutiable by clear implication, to again include them under the guise of an attempt to make market value.

After listening to the able argument of counsel and examining and considering the elaborate briefs presented, we are all agreed that the Stein case was rightly decided, and that any discussion of the principles involved other than those herein adverted to would be but a repetition of the interpretation which we there placed upon the decisions of the Supreme Court, and that the ruling of that case should be affirmed.

Our examination of the authorities on the subject discloses few instances where any court has made any attempt to reverse or modify the pronouncements in the *Stein* and *Bauer* cases, *supra*, regarding the nondutiability of bona fide buying commissions. On the other hand for almost thirty years these decisions have been recognized and followed as the law on this subject.

At the trial counsel for the Government stated its contention in this case to be as follows:

The Government claims in this case that the tree ornaments and the glass novelties were not the subject of a sale of merchandise; that the transactions between these importers, or between any of the so-called purchasers in the home market, from the makers of these articles were not sales of merchandise, but they were contracts for work, labor and material; all statements of the plaintiff's witnesses to the contrary notwithstanding.

The Government contends that it is a matter of law, that it is a question of law the court is being asked to decide in this case. If these are contracts for work, labor, and material, then the price, or the amount, whether it is called price, wage or remuneration, the amount of money paid by Woolworth Company or by Kresge & Company, or by any other purchaser from the homeworkers, the person who made these articles, whether you call him manufacturer, homeworker, or house industry, or whatever you call him, he is the maker of these articles. That amount of money is not the proper basis for finding either foreign or export value, under section 402 of the Tariff Act, which distinctly provides that duty shall be assessed upon the freely offered price in the wholesale market.

The Government contends that a price in a contract, or a transaction which is merely for work, labor and material, rather than a sale of merchandise, is not the freely offered wholesale price described in section 402 of the Tariff Act.

For some undisclosed reason counsel for the Government apparently abandoned all the above contentions, because in its brief filed herein no reference whatsoever is made to said contentions. Suffice it here to say that the evidence offered by counsel for the Government completely fails to establish any of the above claims.

It is clear from the record in this case that whether this 10 per centum be considered as a buyer's commission or otherwise the same, nor any part thereof, does not enter into or constitute any part of the value or price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of Germany, in the usual wholesale quantities and in the ordinary course of trade either for home consumption or for exportation to the United States, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for shipment to the United States.

When this merchandise is sold in the ordinary course of trade no one pays this 10 per centum. It is only paid by those who, for their own convenience, insist upon doing business through a commissionaire. To adopt the language of our own appellate court in the *Sanchez* case, *supra:* "If he had been content to buy his goods as such goods were ordinarily sold for export such additional charges would not have been made. They were not a part of the ordinary export value, and hence can not be deemed dutiable."

Placing this 10 per centum commission on the invoice or omitting it from the same cannot serve to make it a dutiable item. In neither event does it form any part of the value or price at which the merchandise is freely offered for sale in the ordinary course of trade. This 10 per centum commission is not other costs, charges, and expenses incident to placing the merchandise in condition packed ready for shipment to the United States. All the expenses, costs, and charges incident to placing the merchandise in condition packed ready for shipment to the United States are included in the 2½ per centum shown on the invoices and concerning which there is no contention made.

In the purchase and importation of all merchandise there are always certain expenses which have never been held to be a part of the dutiable value of the merchandise. Hundreds of people go abroad each year for the sole purpose of purchasing merchandise and importing it into the United States. All such people have to incur certain expenses which in the end form a part of the cost of the merchandise, but such expenses have never been considered and taken into account in arriving at the proper dutiable value of the merchandise. Had the importers herein elected to purchase the instant merchandise by going to Germany themselves, it is not unreasonable to suppose that their expenses would have amounted to 10 per centum of the freely offered and purchase price of the merchandise, but no one would contend that such expenses should be added to the freely offered and purchase price in order to arrive at the proper dutiable value of the merchandise. The fact that the importers herein find it more economical to keep buyers in Germany than to be sending them back and forth all the time does not operate to make this expense a dutiable item. It is not within that class of costs, charges, and expenses which the law provides shall be included as a part of the dutiable value. This expense is not a part of the ordinary dutiable value, and hence cannot be deemed dutiable.

After a full consideration of this entire record, we find as facts:

1. That the merchandise involved in these appeals consists of Christmas-tree ornaments, glass novelties, and glass cocktail sticks or fruit picks imported from Germany during the years of 1934, 1935, 1936, 1937, and part of 1938.

2. That the principal market in the country of exportation for all the merchandise covered by these appeals is located in the Sonneberg-Lauscha district of Germany.

3. That at the dates of exportation Christmas-tree ornaments, such as and similar to those involved in these appeals, were freely offered for sale to all purchasers in the principal market of Germany in usual wholesale quantities and in the ordinary course of trade for consumption in Germany and for exportation to the United States and other countries, at the prices contended for by the importers herein.

4. That at the dates of exportation glass novelties and fruit picks or cocktail sticks, such as and similar to those involved in these appeals, were freely offered for sale to all purchasers in the principal market of Germany in the usual wholesale quantities and in the ordinary course of trade for exportation to the United States at the prices contended for by the importers herein, and that such or similar merchandise was not offered for sale or sold in said market at higher prices for domestic consumption or for exportation to countries other than the United States.

5. That the sales and offers for sale of the various types of this merchandise made by the manufacturers were freely offered and freely made sales and were in the ordinary course of trade.

6. That the prices for this merchandise did not vary according to the quantity sold, and therefore there is no necessity for finding what constitutes a wholesale and a usual wholesale quantity.

We therefore conclude as matter of law:

1. That the proper dutiable foreign and export values of the Christmas-tree ornaments exported prior to January 1, 1938, are the unit invoice prices, plus packing and cost of cases as invoiced, as defined in section 402 (c) and (d) of the Tariff Act of 1930.

2. That the proper dutiable foreign and export values of the Christmas-tree ornaments exported subsequent to January 1, 1938, are the unit invoice prices, plus 3½ per centum social assessments, plus packing and cost of cases as invoiced, as defined in section 402 (c) and (d).

3. That the proper dutiable export values of the glass novelties and fruit picks or cocktail sticks exported prior to January 1, 1938, are the unit invoice prices, plus packing and cost of cases as invoiced, as defined in section 402 (d).

4. That the proper dutiable export values of the glass novelties and fruit picks or cocktail sticks exported subsequent to January 1, 1938, are the unit invoice prices, plus 3½ per centum social assessments, plus packing and cost of cases as invoiced, as defined in section 402 (d).

5. That the 10 per centum commission specified on the invoices is not a dutiable item and should not be included as a part of either foreign or export value.

The decision and judgment of the trial court holding this 10 per centum commission to be a dutiable item is therefore reversed. Judgment will be rendered accordingly.